Chief Judge Breitel.
This appeal involves rent-controlled apartments under State and local legislation following the close of World War II affecting then existing buildings.' It does not involve rent-stabilized buildings or vacancy-decontrolled apartments subject to different laws and regulations.
Petitioner-appellant brought an article 78 proceeding, on behalf of itself and similarly situated landlords of some 30,000 rent-controlled apartment buildings in New York City, to establish their right to collect a 7%% annual rent increase under the City Rent Control Law (Administrative Code of City of New York, § Y51-1.0 et seq., as amd. by Local Laws, 1970, No. 30 of the City of New York, July 10, eff. Jan. 1, 1972). Since their actual collectible rents were lower than their maximum base rents (MBRs) as computed in 1972, these owners were heretofore permitted a 7%% annual rent increase until they reached their 1972 MBR (§ Y51-5.0, subd. a, par. [5]). Respondent rent commissioner contends, however, that any *216 further annual increase must he predicated on qualification for a new 1974 MBR, for which the statute mandates biennial recalculation (§ Y51-5.0, subd. a, par. [4]).
The principal issue is whether the landlord is entitled to the annual rent increase towards its 1972 MBR, despite the fact that its 1974 MBR had not yet been calculated by the city and may not be until early 1975. Also at issue is whether this annual rent increase is conditioned on the landlord’s showing an expenditure of at least 90% of the total cost index for operation and maintenance assigned to its building, this being a statutory requirement for obtaining the 1974 MBR. Finally, if the 90% expenditure is prerequisite, it is disputed whether the formula for qualification should reflect discrepancies between actual collectible rents and the MBRs.
The courts below reached different results on both issues. Special Term held that the 7%% annual rent increases were unrelated to and not conditioned on the biennial readjustment of the MBRs. Moreover, the court ruled that a showing of 90% expenditure for operation and maintenance was not a prerequisite for the annual rent increase, but suggested that, as a condition subsequent to the rent rise, the landlord would have to make up any expenditure deficiency in the following year. The Appellate Division, unanimously reversing, held that the statute contemplated á biennial “ disestablishment ” of the old MBRs and the recomputation of current MBRs for which the landlords would have to qualify anew. The 7%% rent increase for 1974 could not be taken as of right, but rather, only in conjunction with obtaining a 1974 MBR showing a 90% operation and maintenance expenditure. The Appellate Division did, however, construe the 90% expenditure requirement as incorporating the ratio between the actual collectible rent and the maximum base rent.
The order of the Appellate Division should be modified. In view of the rent control law’s purpose of preserving the city’s existing stock of rent-controlled apartments, and given the rent commissioner’s tardiness in promulgating the 1974 MBRs at a time of financial exigency for the landlords, the rents in 1974 should be allowed to rise by 7%% towards the ceilings represented by the 1972 MBRs. These increases must, however, be conditioned on a showing of 90% expenditure for operation and *217 maintenance, albeit under the modified formula accepted by the Appellate Division.
The City Rent Control Law, as amended in 1970, was designed to cope with the problem of ‘ ‘ disinvestment ’ ’ and abandonment of rent-controlled buildings. Its aim was to allow for gradual decontrol of rents in a manner that would take into consideration the landlords’ interests in making their enterprises profitable and the tenants’ interests in continued upkeep of their buildings without precipitous rent rises. To this end a maximum base rent was established for January, 1972 as a ceiling towards which the rents of each building could rise at a rate of no more than 7%% each year. Moreover, beginning in January, 1974, the MBRs were to be revised biennially to accommodate to changes in operating expenses.
The provision for biennial recalculation of the MBR is mandatory in terms (see Administrative Code, § Y51-5.0, subd. a, par. [4]). There is nothing to support the landlord’s contention that MBR readjustments are optional at landlord’s discretion. If the statutory mechanism is followed correctly, the 1974 MBRs should replace the 1972 MBRs, and the latter would become inoperative.
The 7%% annual rent rise must at minimum be interrelated with this mandatory biennial readjustment of the MBRs on the possibility, albeit unlikely, that a downward adjustment of the MBR would forestall the 7%% rent rise anticipated under the prior MBR. Conceptually, at least, the 7%% annual increases in every second year should await the formulation of the new MBRs, and to this -extent the Appellate Division was correct (but see its later memorandum opn. in Bedford Bldg. Co. v. Beame, 45 A D 2d 950 seemingly allowing increases by “ complying ” landlords without delay due to the agency failure to promulgate new 1974 MBRs).
As a practical matter, however, this court cannot ignore that the rent commissioner may delay issuing the 1974 MBRs over a year beyond the date fixed by statute. To deny landlords their annual rent increases in the interim, on the basis of a strict statutory reading, would impose an unjust hardship at a time of financial exigency far beyond that foreseen by the statute’s draftsmen.
*218 The 1974 MBBs were to have been ready by December 31, 1973. The city now hopes that they will be issued by the end of 1974. The 1972 MBBs, however, were delayed a full 15 months, a delay which then impelled the courts to issue an interim order permitting the landlords to collect the 7%% rent increase (see Benson Realty v. Walsh, 71 Misc 2d 339, app. dsmd. 40 A D 2d 592).
The history of the City Bent Control Law of 1970 clearly shows the legislative intention to allow rents of rent-controlled buildings to rise gradually but consistently towards the MBB ceiling.* However elusive that ceiling may be, this year, at least, the possibility of the MBBs being lower than in 1972 is no longer even a possibility. In a year of overvaulting inflation, where the operating expenses of rent-stabilized apartments have risen at least 20%, it would surely contravene the statutory purpose to deny landlords their 7%% annual increases while the city delays (see, generally, Bureau of Labor and Statistics, U. S. Department of Labor, 1974 Price Index of Operating. Costs for Bent Stabilized Apartment Houses in New York City).
On the other hand, the 7%% rent increase for 1974 should be conditioned on compliance with the requirement of 90% expenditure on operating and maintenance. Concededly, the statute expressly ties this requirement only to obtaining the biennially recalculated MBB, not to taking the 7%% annual rent increase (see Administrative Code, § Y5L-5.0, subd. g, par. [6], cl. [d]). Nevertheless, the biennial revision of the MBBs is mandatory, and the concomitant 90% expenditure requirement must be met for continued increases under the rent-control program. One of the rationales for the MBBs was to assure that landlords who sought and obtained rent increases would spend most of the added money to maintain and improve their deteriorated buildings. The function of biennial requalification is implicit in the statute, and there is no countervailing reason for not enforcing it because the issuance of new MBBs is administratively delayed. Indeed, since the cost of operating and maintaining the apartments, at least properly, has increased *219 nearly 27% between 1972 and 1974, the operation and maintenance allowance calculated in 1972 is disproportionately small (see Bureau of Labor and Statistics, IT. S. Department of Labor, 1974 Report, p. 4). Failure to make the required expenditure on even the 1972 allowance would therefore represent the kind of “ disinvestment ” the statute was designed to discourage.
Finally, the court agrees with the Appellate Division that a literal application of the 90% expenditure requirement to petitioner, and others similarly situated, would produce an absurd and unintended result. The maximumxbase rents were designed to allow the landlords an 8%% return on capital investment, based on the assessed value of the buildings for real estate tax purposes, after equalization (Administrative Code, § Y51-5.0, subd. a, par. [3]; see N. Y. City Rent and Eviction Regulations, § 24, subd. b, par. [5]; subd. d). This return on investment, added together with the expenses allowed for real estate taxes, water charges, sewer rents, and operating and maintenance, composed the maximum base rent. It was estimated that in the average case the return on capital investment would constitute about 42.4% of the MBR, and that the Operating and Maintenance Expense Allowance would average about 39% of the MBR (see N. Y. C. Housing and Development Administration Report: The Maximum Base Rents Formula — A Cost Index Approach to Controlled Rents [1971], pp. 22, 27, 51).
Petitioner landlord, whose situation may be, as asserted, comparable to that of nearly half of the building owners under the control program, had in 1973 collectible rents of only $14,957.52, or under 70% of its 1972 MBR of $21,467. With an operating and maintenance allowance of $11,269.40, a literal application of the 90% expenditure requirement would have required new investment by it of $10,142.46. If the other MBR components in 1973 were at the levels which petitioner reported in 1971, and they are no doubt higher, then real estate taxes were $2,377.12 and water and sewer charges were $645. Thus, of the $14,957.52 in rents actually collectible, no more than $1,813 would conceivably have been available for a return on capital investment. Yet the proper return on investment for petitioner’s building, based on an assessed valuation of $56,000, equalized at a rate of 1.754, should have been over $8,000.
*220 This could not. have been the result intended by the statute. Nor would the so-called “ hardship provisions ” of the control law mitigate the intolerable -consequences for petitioner, since they only provide for .raising the MBB when it proves insufficient, and would not help a landlord operating well below his MBB (see Administrative Code, § Y51-5.0, subd. g, par. [1]).
A fair and proper construction, therefore, is that the 90% expenditure requirement must incorporate the ratio between the MBB and the rents actually collectible. Petitioner would have to expend 70% of 90% of the allowance of $11,269.40, that is, $7,099.72. Since petitioner in fact expended $9,108.93, it met this requirement for obtaining its 7%% rent increase in 1974.
This appeal has involved difficulties rarely confronting a court. The patchwork of rent-control legislation in recent years has created an impenetrable thicket, confusing not only to laymen but to lawyers. Most important, under legitimate political pressures and the stress of economic and social tensions, the rational resolution of policy considerations vital to the well-being of the people in the City of New York have been handled on a day-to-day basis, and often by temporary makeshifts. As a consequence, the legislation contains serious gaps, not readily filled by interpretation based on intention, because there was none, or even by judicial construction to make reasonable and workable schemes, that are self-abortive as designed. There is a limit to which courts may or should go in rectifying such statutory gaps. Because of the significant policies involved, they should be resolved by legislative action at the local or State level. At stake is thé conservation of needed housing, the well-being of the residents of the city, and the according of respect to the property interests of building owners. Once before this court called attention to the course to be taken in seeking remedial legislation (210 East 68th St. Corp. v. City Rent Agency, 34 N Y 2d 560, 562).
Under' the circumstances, the courts below and this court have endeavored to do what they can to correct a troubled situation. Ultimate resolution requires correction at the legislative level, State or local, and not at the judicial level. The courts have limited access to the controlling economic and social facts. They are also limited by a decent respect for the separation of powers upon which our system of government is based.
*221 Accordingly, the order of the Appellate Division should he modified to allow 7%% annual rent increases to petitioner and other landlords similarly situated who qualify under the statute in accordance with the opinion herein, and the order otherwise affirmed, without costs.
Judges Gabrielli, Jones, Wachtler, Rabin, Stevens and Wither* concur.
Order modified in accordance with the opinion herein and, as so modified, affirmed, without costs.

 See, e.g., N. Y. C. Housing and Development Administration Report: The Maximum Base Rents Formula — A Cost Index Approach to Controlled Rents (1971).

 Designated pursuant to section 2 of article VI of the State Constitution.