Fuchsberg, J.
 

 This article 78 proceeding brings before us, once again, inadequacies in the administration of the Rent and Rehabilitation Law of the City of New York (Administrative Code of City of New York, § Y51-5.0, subd a, pars [3], [4], known as the Rent Control Law), which, despite our repeated urging that it receive "correction at the legislative level, State or local”, apparently continues unreformed
 
 (Matter of 89 Christopher v Joy,
 
 35 NY2d 213, 220; see, also,
 
 Bedford Bldg. Co. v Beame,
 
 38 NY2d 729, 731;
 
 210 East 68th St. Corp. v City Rent Agency,
 
 34 NY2d 560, 562).
 

 The petitioners, tenants and organizations representing tenants of accommodations subject to rent control, suing on behalf of the named tenants and all others similarly situated,
 
 [1]
 
 raise three issues. All three relate to the issuance of the 1974-1975 Maximum Base Rent (MBR) orders which set the outer limits within which permitted rent increases are to be computed (Administrative Code, § Y51-5.0, subd a, par [5]).
 

 First, the petitioners challenge the legality of the agency’s use of the average experience of only a small fraction of the approximately 74,000 buildings involved to arrive at an "8 1/2% standardized increase factor” as the determinant of the percentage by which all MBRs were to be increased over those for 1972-1973. They take the position that section Y51-5.0 (subd a, par [3]) requires that the computation must instead be made on a building-by-building basis, which would take into
 
 *137
 
 account each one’s separate operating experience, the method used in 1972-1973.
 

 This matter cannot be discussed intelligently or realistically without pointing out that all parties agree, as indeed they must, that the hopelessly bogged-down condition of rent control administration on which we commented in the
 
 Christopher
 
 case, by October, 1974, when the agency first announced its averaging plans, if anything, had become worse. At the pace at which the city agency was proceeding, it might be literally many years before the statutorily required biennial MBR adjustments to economic change could be put into effect. The achievement of the purposes of rent control—the preservation of the existing stock of rent-controlled units,
 
 [2]
 
 the prevention of hardship to tenants and landlords alike, the encouragement of improvement of salvageable buildings and the preservation of others against deterioration—could not withstand such delay. The need for decent housing for the city’s millions and the need for economic feasibility so that owners could meet their day-to-day responsibilities, both were —and, regretfully, still are—at the heart of the needs of the city itself.
 

 Therefore, at a time of recognized and universal monetary inflation, and "in order to avoid turmoil in the housing industry and to enable landlords to maintain their buildings and to avoid large retroactive payments by tenants”, we affirmed an order of the Appellate Division which permitted the granting of interim rent increases to owners in advance of the issuance of new MBRs, though such an advance was not in accord with the literal language of the ordinance
 
 (Bedford Bldg. Co. v Beame,
 
 38 NY2d 729, 731,
 
 supra).
 
 Similarly, an avoidance of disaster for the people of the city today, whether landlords or tenants, now compels us to withhold judicial intervention against the expedient substitution of a statistical average for the individual determinations the statute appears to prefer. If the city or State Legislatures intended a less flexible interpretation of the statute, they would long since have applied remedial legislation to the administrative morass in which the New York City Rent Control Agency finds itself. As it is, given the limited operational budget with which the agency pleads it has to work, this part of the statute may very
 
 *138
 
 well be one of those which we have had occasion to term "self-abortive as designed”
 
 (Matter of 89 Christopher v Joy,
 
 35 NY2d 213, 220,
 
 supra).
 

 Of course, for the sampling techniques and statistical methods pursuant to which the average here was obtained to be acceptable, they needed to be sound, fair, representative and, in general, designed to produce an accurate result, for while statistics may aid in ascertaining facts they may not substitute for them
 
 (Matter of Mid-Island Shopping Plaza v Podeyn,
 
 25 Misc 2d 972, 976-978, affd 14 AD2d 571, affd 10 NY2d 966;
 
 315 West 97th St. Realty Co. v Bowles,
 
 156 F2d 982, cert den 329 US 801;
 
 Matter of Town of Smithtown v Moore,
 
 11 NY2d 238, 246-247). But, as these cases also indicate, it is the one who attacks them, here the petitioners, who must bear the burden of showing that the average promulgated by the agency falls short of these standards; the petitioners here did not carry this burden. Indeed, it is reassuring to note that the statistical variance calculated by the agency was very small. And, since both the individual computations employed on the units in the statistical sample and the average derived from the sample were both intended as means to arrive at an accurate percentage increase in the MBR, it cannot be said, though presumably in some cases the result might have been more precise by employment of the first rather that the second method, that any substantial basis for an equal protection argument lies in the fact that the average was not used in the 9,000 cases which had already been individually computed.
 
 [3]
 

 The second issue raised by the petitioners is a demand for implementation of the Rent Control Law’s provision that "the city rent agency shall require each owner to make available” its books and other pertinent financial records for audit by the agency at least once every three years. Petitioners ask that the agency be required actually to perform such audits, so that it may ascertain whether claimed cost factors are excessive before any MBR order issues (Administrative Code, § Y515.0, subd a, par [4]).
 

 
 *139
 
 Clearly, periodic agency audit of landlords’ books would be desirable in order to avoid error or abuse. However, the law only requires that "each owner * * * make available [to the agency] for examination his books” (Administrative Code, § Y51-5.0, subd a, par [4]); it does not specifically require, as a precondition to the issuance of an MBR, that the agency in fact make the audit. The extent to which the agency exercises its right to audit is, therefore, in the posture of the present legislation, a matter of administrative discretion. And whether it would be better that audits be mandated is obviously a matter for the Legislature, particularly since the agency advises us that comprehensive auditing would require over 300 full-time accountants; it has funds to employ but 24.
 

 Finally, petitioners contend that the agency’s procedure, under which the actual calculation of the new "average” MBR and the corresponding rent increase is left to the landlords themselves, constitutes an impermissible delegation of power and a violation of tenants’ due process rights. Urging that such a procedure abdicates the responsibility of the agency to reach an impartial computation and that it exposes tenants to possible fraud or error, they point out that the owners’ computations are presented to tenants on forms supplied by the city and bearing the agency’s imprimatur, so as to lull most tenants into the belief that the computations have been officially screened. The wisdom and efficacy of this procedure may, indeed, not be free from question, especially since the administrative burdens involved in massive rent control have' led to legislation providing only the right to limited administrative review after an MBR has been issued and not to notice or a hearing before rents are adjusted. It is probably no mere coincidence then that, despite widespread and well-publicized dissatisfaction, as is asserted in the briefs on this appeal, only 12 tenants out of the many hundreds of thousands affected by the law saw any point in requesting the agency to recalculate their 1974 MBRs.
 
 [4]
 
 However, though the delegation, therefore,
 
 *140
 
 may leave much to be desired as an administrative device, the fact remains that no statute or regulation forbids it. Furthermore, the functions performed by the owners appear to be intended to be sufficiently ministerial in nature so that we cannot say the delegation of this task is unconstitutional (cf.
 
 8200 Realty Corp. v Lindsay,
 
 27 NY2d 124).
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Wachtler and Cooke concur.
 

 Order affirmed, without costs.
 

 [1]
 

 . The estimate of tenants in New York City who remain subject to rent control appears somewhat inexact. According to a report entitled "The Rental Housing Situation in New York City 1975” issued by the City of New York Housing and Development Administration Office of Rent Control (Jan., 1976), as of that time there were a total of 1,999,000 housing units, of which 642,000 were rent controlled and 467,000 were former rent-controlled units which had been transferred to "stabilization” when they were vacated and became available for changed tenancies under chapter 576 of the Laws of 1974.
 

 [2]
 

 . In 1949, there were 2,442,684 housing units in New York City (Survey of Rents, State of New York Temporary State Housing Rent Commission [Nov., 1950]), 442,684 more than existed 25 years later
 
 (supra,
 
 n 1).
 

 [3]
 

 . The 1974-1975 MBR should have been in effect on January 1, 1974. By October 7, 1974, when the city rent agency announced that it would "not be able to continue calculating individualized Maximum Base Rents based on the operating experience of each building”, it had computed and established new MBRs for approximately 9,000 buildings. It thereupon applied the "averaging” approach under its "New Maximum Base Rent Crash Program” to the remaining 65,000 buildings, leaving those earlier computed for the 9,000 on an individual basis in force.
 

 [4]
 

 . The present statute permits a tenant to request a recalculation of his 1974 MBR only upon a showing that the building’s assessed valuation has been greatly reduced, that the percentage of building space devoted to commercial usage has greatly increased, or that the services provided to tenants have been much reduced since 1972. In contrast, in 1972, when the first MBRs were issued and tenants could challenge these upon a showing of
 
 any
 
 material abuse or error, there were some 25,451 recorded tenant complaints (Departmental Memorandum of the Commissioner, Housing and Development Administration, July 24, 1973, contained in the record on appeal to this court in
 
 210 East 68th St. Corp. v City Rent Agency,
 
 34 NY2d 560).