OPINION OF THE COURT
Fuchsberg, J.
This appeal calls upon us to say whether the effect of the State’s enactment of chapter 576 of the Laws of 1974, including its section 4 (Emergency Tenant Protection Act of 1974), was to extend “rent stabilization” to tenants residing in class B multiple dwellings in New York City. Needless to say, in doing so, our duty is neither to expand nor contract rent regulation, nor, for that matter, to impose our own judgment as to whether one manner of achieving it or another is wise or necessary. Rather, since such considerations are most often within the sole province of the Legislature, our own task, of course, is to interpret, not alter, the statutes by which that branch of the government has decided to implement the underlying decisions it has reached. For the reasons which follow, the statutory language, antecedent history and practical construction of chapter 576 compel us to conclude the class B multiple dwellings are not within this statute’s embrace.
We begin with a definition, that of multiple dwellings, which, as defined by statute, are premises “rented, leased, let or hired out, to be occupied, or [are] occupied as the residence or home of three or more families living independently of each other” (Multiple Dwelling Law, § 4, subd 7). These dwellings are classifiable, somewhat overlappingly, as either A or B (Multiple Dwelling Law, § 4, subd 7). A class A multiple dwelling “is occupied, as a rule, for permanent residence purposes” while a class B multiple dwelling, essentially not one constructed for householding, “is occupied, as a rule transiently, as the more or less temporary abode of individuals or families who are lodged with or without meals” (Multiple Dwelling Law, § 4, subds 8, 9).
Since 1976, the tenant, Robert Cavanaugh, has resided in a pre-1947 class B multiple dwelling owned by the landlord, Mildred La Guardia. In June, 1978, the landlord, alleging a default in the tenant’s payment of rent for his 10-foot by *70 12-foot room in Manhattan’s Chelsea neighborhood, commenced a summary dispossess proceeding in New York City Civil Court. In accord with statutory and regulatory provisions, which require that the petition by which such a proceeding is initiated contain a statement as to the building’s regulatory status (see Real Property Actions and Proceedings Law, § 741, subd 4; 22 NYCRR 2900.21 [e]), it stated that the building was a class B multiple dwelling and, therefore, not subject to the Rent 'Stablization Law of 1969, which, as amended, had spoken only of class A buildings as such.
The issue was joined when the tenant moved to dismiss the petition on the ground that the building indeed was subject to this statute. Whether the motion was formally denied before trial or was simply subsumed in the Civil Court’s judgment is not clear from the record. In any event, the case proceeded to trial and eventuated in a judgment for the landlord. On appeal, the Appellate Term, expressly finding that class B multiple dwellings are not subject to the prevailing stabilization law, modified the judgment as it related to the amount of rent found to be due, but affirmed in all other respects. In turn, the Apellate Division unanimously affirmed, without opinion, and granted leave to appeal to this court.
The simplicity of this factual and procedural background is in sharp contrast to the maze of relevant rent laws on whose interpretation its resolution depends. A “patchwork” of legislation that has responded to decades of social, economic and political pressure, it has been characterized by this court as an “impenetrable thicket confusing not only to laymen but to lawyers” (Matter of 89 Christopher v Joy, 35 NY2d 213, 220). Perhaps this should not be surprising in a changing series of controls which, though they have been with us now for. so long, more often than not have been extemporized as “emergency” or “temporary” measures. It is nonetheless essential to our analysis that we make some order of this morass.
To that end, we note that there are two basic forms of rent regulation presently applicable to New York City: rent control and rent stabilization.
*71 The city’s rent control law is a direct descendant of Federal regulation which, during World War II, was imposed by the former Office of Price Administration to deal with the aftermath of a war-stimulated housing shortage (Federal Emergency Price Control Act of 1942, US Code, tit 50, Appendix, § 901 et seq.; see Levy, Rent Control in New York City, 47 NYS Bar J 193). After hostilities ceased, though the descriptively named Office of Price Administration was disbanded, Federal regulation was continued under the aegis of the Federal Housing and Rent Act of 1947 (US Code, tit 50, Appendix, § 1881 et seq.).
A tracking of ensuing legislative developments reveals that, starting in 1946 and in anticipation of the lifting of Federal controls, the State formulated its own standby plan to meet what it perceived to be a continuing problem (see Emergency Housing Rent Control Law, L 1946, ch 274; amd L 1947, ch 704, L 1948, ch 678, L 1949, ch 591). As might be expected, when the State statutory scheme took over, it eased the transition by patterning itself in part after the one it supplanted. Significant in the context of this case is that the State’s statute took as its own the exemption from regulation which latter day Federal administration had granted to housing built after 1947 (see L 1950, ch 250,. § 2, subd 2, par [g] ; Federal Housing and Rent Act of 1947, US Code, tit 50, Appendix, § 1892, subd [c], par [3]; Pitts v McGoldrick, 302 NY 938, affg without opn 200 Misc 150; Teeval Co. v Stern, 301 NY 346).
It suffices for our purposes to now move to 1962, when our State Legislature passed the Local Emergency Housing Rent Control Act (L 1962, ch 21). In essence, this act delegated complete authority over rents for housing accommodations within the boundaries of New York City to that municipality (L 1962, ch 21, § 1, subd 5). The city then followed suit by enacting its own rent control law (City Rent and Rehabilitation Law, Local Laws, 1962, No. 20 of City of New York, Administrative Code, § Y51-1.0 et seq.). Its ordinance did not differentiate between class A and B multiple dwellings. At that time, it imposed its control over both.
However, the city law, as had Federal and State regula *72 tion before it, continued the exemption for post-1947 dwellings. The laissez-faire rationale for leaving this newer stock of housing uncontrolled was that “the market, governed by supply and demand, would work reasonably and controls would be unnecessary” (8200 Realty Corp. v Lindsay, 27 NY2d 124, 136). But this expectation proved to be unfounded. An inflationary spiral in the late 1960’s operated on a contracting housing supply to enable landlords of many post-1947 buildings to demand large rent increases (id.; Levy, 47 NYS Bar J 193, 194).[1]
This brought further local legislative action. The New York City Council, resorting to the authority with which it had been endowed by the Local Emergency Housing Rent Control Act back in 1962, reacted by passing the so-called Rent Stabilization Law of 1969 (RSL of 1969) (Local Laws, 1969, No. 16 of City of New York, Administrative Code, § YY51-1.0 et seq.).[2]
In pertinent part, this ordinance provided: “§ YY513.0 Application. This law shall apply to class A multiple dwellings not owned as a cooperative or as a condominium, containing six or more dwellings units which: a. were completed after February first, nineteen hundred forty-seven, except [the categories of dwelling units here enumerated] .”[3]
*73 It was in this fashion that rent regulation for the first time was extended to the theretofore uncontrolled post-1947 buildings. But, as the text of this local legislation reveals, save for its specified and on this point irrelevant exemptions, it expressly took in only class A dwellings. Neither directly nor indirectly, neither by name nor by description, did it include those categorized as class B. Thus, in an important respect, this exercise of local power facially was narrower than the broader options which had been committed to it by the 1962 State seminal statute from which derived the city’s right to legislate on this matter.
Breaking it down more concisely, section YY51-3.0 established four prerequisites for the application of its provision. The building had to (1) be a class A multiple dwelling; (2) not be owned as a co-operative or as a condominium; (3) contain six or more dwelling units, and (4) have been completed after February 1, 1947. The result was to exclude class B multiple dwellings from the coverage of the Rent Stabilization Law of 1969. Thus was the relevant range of regulation by stabilization limited.
Nevertheless, surely, as of then, this represented a high water mark for expansion of rent regulation in New York City. For the next substantial remodeling of the statutory structure, this time cutting back on the range of regulation, was not too long in coming. In the wake of the passage of the city’s Rent Stabilization Law, new construction had come to a virtual standstill. Fear of the economic impact of future local rent control legislation had caused private sector builders and investors to withdraw from the market. And, the lack of incentive for maintenance and upgrading of existing housing was leading to massive deterioration and abandonment of older buildings. In 1971, the State decided to intervene With overriding legislation. (See Memorandum of State Executive Department, McKinney’s Session Laws of NY, 1971, pp 2400-2401; Governor’s Memorandum on Approving L 1971, chs 371-374, McKinney’s Session Laws of NY, 1971, pp 2608-2609).
One of the remedial statutes adopted for that purpose was the “Vacancy Decontrol Law.” It provided that “[notwithstanding any local law or ordinance, housing accom *74 modations which become vacant shall be exempt from regulations and control” (L 1971, ch 371, §6). Enacted simultaneously was the “Urstadt Law” (L 1971, ch 372), which prohibited New York City from regulating any housing accommodation which was either then exempt from control or might become so in the future pursuant to chapter 371. The net effect of these laws was to destabilize or to decontrol, as the case might be, any specific apartment upon the tenant’s departure therefrom and to preclude New York City from enacting any legislation which would increase regulation of housing. Class A and Class B multiple dwellings were both subject to the vacancy decontrol laws.[4]
However well intended, these legislative efforts too turned out to be no panacea for the New York City housing quagmire. While the tenants who resided in apartments which had been destabilized or decontrolled were subjected to ever-increasing rents, the massive construction which had been envisioned did not materialize. To complicate matters, the city’s rent control administration itself was becoming so “hopelessly bogged-down” that mandated adjustments would eventually be literally years in arrears (Matter of Tenants’ Union of West Side v Beame, 40 NY2d 133, 137). Once again, a solution was sought in “emergency” State legislation, chapter 576 of the Laws of 1974.[5]
Section 4 of this chapter — The Emergency Tenant Protection Act of 1974 (ETPA) — is not a rent and eviction regulating law. Instead, it is an enabling act, which em *75 powered New York City and certain suburban local governments[6] to impose, or, as in New York City, where it already existed, to extend rent stabilization. To do so, the legislative body of the local government is required to declare the existence of an emergency in the supply or condition of housing accommodations within its jurisdiction (ETPA, § 3). Such-declaration of emergency is permitted as to “all or any class or classes of housing accommodations” in a municipality, subject to enumerated exceptions including one which provides that “housing accommodations subject to the * * * local emergency housing rent control act” would not be regulated by the ETPA (ETPA, § 5, subd a, par [1]). However, which “housing accommodations” are in fact to be affected is left to the locality.
Also relevant here is section 7 of chapter 576, which provided for the amendment of the “applicability” provision of New York City’s Rent Stabilization Law of 1969 (§ YY51-3.0).[7] Except for renumbering, it did so by adopting the original verbatim text of the city’s section YY51-3.0 as its very own. The sole substantive change was to add a subdivision lettered “b”. Graphically, this section of the city’s stabilization law, as adopted by State law, reads as follows:
“YY51-3.0 Application
“This law shall apply to
“a. Class A multiple dwellings not owned as a cooperative or as a condominium, containing six or more units which: (1) were completed after February first, nineteen hundred forty-seven * * * and
“b. other housing accommodations made subject to this law pursuant to the emergency tenant protection act of nineteen seventy-four.” (Emphasis is added to identify the new matter.)
*76 In due course, New York City invoked the protections of the ETPA by declaring an emergency in a broadly worded resolution: “[T]he Council hereby determines that * * * [an] emergency exists and will continue to exist for all classes of housing accommodations within the City of New York ” (New York City Council Res No. 276, June 20,1974).
h ow, it is essentially on the breadth of this declaration and the seemingly all-encompassing nature of the bald language of section YY51-3.0’s new subdivision b that the tenant posits its contention that the city and the State Legislature implicitly extended rent stabilization beyond post-1947 class A multiple dwellings to take in pre-1947 class B multiple dwellings as well. Given that chapter 576 was to effect some expansion of regulation, it cannot be gainsaid that this argument has at least a superficial appeal. However, on closer consideration, it proves too much. For, if taken to its logical conclusion, it would extend rent stabilization to all housing accommodations other than those which had been specifically exempted from regulation by section 5 of the ETPA. By so doing, it would effectively render subdivision a of section YY51-3.0 a nullity.
But this would have made the affirmative act of importing subdivision a of section YY51-3.0, lock, stock and barrel, into the State statute all but pointless. Had the 1974 intention been to do a turnabout by including class B dwellings, the last thing one would have expected was an unaltered re-enactment. At the very least, the newly added subdivision b then would have carried some indication that it qualified or modified the now long-established impact of subdivision a on “multiple dwellings”. Instead, from the State’s precise, down-to-the-last syllable duplication of the original subdivision a of section YY51-3.0 as it was lodged in New York City’s Administrative Code, it can only be assumed that the State Legislature’s sophisticated bill drafters, in their avoidance of even the slightest amendment in its terminology, were carrying out an intent to eliminate any need for reinterpretation.
Moreover, whatever the other directions in which the *77 city may have wished to extend stabilization, both the practice and the policy it consistently and unmistakingly pursued after its proclamation was one completely at odds with any plan to resurrect regulation of class B dwellings. To the contrary, these essentially kitchenless, bathroomless single-room accommodations, while they may have been swept into the orbit of the original omnibus wartime controls, were by the 1970’s “obsolescent” and in the process of being phased out of New York City’s housing inventory (Sternlieb and Hughes, Housing and People in New York City, Jan. 1973, reprinted in 1973 Proceedings of the Council of the City,of New York, vol 1-A, p 490). Where there had been approximately 129,000 units in 1960, in 1970 the number had fallen to 63,000 and in 1978 stood at 25,000 (Sternlieb and Hughes, p 490; Marcuse, Rental Housing in the City of New York, reprinted in the City Record, stated meeting of Feb. 27, 1979, p XXVIII).
The city government was no passive witness to this decline. It gave it strong encouragement. Characteristic of its regulatory disfavor of class B housing was its so-called section J51 program of tax abatement for improvement of substandard dwellings. Under it, during all of the past decade, the city offered its incentives to class B multiple dwellings only if and when these were upgraded to class A and were no longer used in whole or in part for single-room occupancy (see Administrative Code, § J51-2.5, subd a, par 2; subd b; subd d, par 2). Paradoxically, most often this meant they could only survive if they disappeared.
That was not all. An equally persuasive indication that the addition of subdivision b of section YY51-3.0 did not cut back on the 1974 State-adopted edition of subdivision a of section YY51-3.0’s exclusion of class B multiple dwellings is to be found in the fact that, in the nearly seven years that it has now been on the books, the city has not been governed by the reading the tenant now would force upon it. Instead, the Rent Stabilization Association, the agency charged with direct responsibility for the stabilization program, gave the exclusion of class B dwellings its imprimatur of approval (see Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459).
*78 More specifically, when, as we have seen, New York City introduced the concept of rent stabilization in 1969, in what was then an experiment in self-regulation, it specifically authorized the Rent Stabilization Association, whose members are interested property owners, to draft a code detailing the terms and conditions of such tenants’ occupancies (Administrative Code, § YY51-6.0, subd b, par [2]). In 1974, the State indorsed this plan for New York City when it authorized the methodology for administration of the 1969 ordinance to apply to the housing brought under stabilization by chapter 576 (ETPA, § 8, subd c).
These grants of authority to the association, first by the city and then by the State, were never untrammeled. At all times, both when the association drew the initial code and, subsequently, when it proposed changes, the city’s official Housing Development Administration (now its Department of Housing Preservation and Development), in which resided over-all supervision of the regulatory process, had to give approval (see Administrative Code, § YY51-6.0, subd b, par [2]; subd c).[8] It was pursuant to this procedure that the code, even after chapter 576 was passed, provided that it would apply to those dwelling units “located in any Class A multiple dwelling” (Code of Real Estate and Stabilization Assn. of New York City, § 2, subd [f]; emphasis added). As the Appellate Division put it comprehensively in Axelrod v Starr (52 AD2d 232, 236, affd 41 NY2d 942), the State “ [continued] the old provisions of section YY51-3.0 which had existed since 1969”. In the face of all this, that neither the State nor the city in all this time had taken any action to upset the practical construction that has been in force is most strongly suggestive that it truly reflects the intention of its sponsors (see Engle v Talarico, 33 NY2d 237, 242).
Finally, even when this less than ideally drawn statute is read in isolation, balanced analysis leads to the same *79 conclusion. The tool we take to this task is the legal diplomacy of the common-sensible statutory construction principle that, “when it is practicable to give to each a distinct and separate meaning”, effect shall be given to every part of an enactment (McKinney’s Cons Laws of NY, Book 1, Statutes, § 231). By that criterion, we cannot overlook the fact that the theory tendered by the tenant fails to reconcile the continuing viability of subdivision a with a purposeful subdivision b. To be sure, the thrust of subdivision b was to widen the regulatory scope of the stabilization system launched by the city in 1969. Nonetheless, the internal evidence makes manifest that the State did not intend to assert its prerogative that subdivision b become a catchall to gather all housing within its regulatory embrace.
A noteworthy difference between the two subdivisions is that “a” stays with the long-used statutory term “multiple dwellings”, while subdivision b speaks more vaguely of “other housing accommodations’ ’. Thus the first subdivision defines the class of multiple dwellings which could be within the embrace of the rent stabilization law. Only those which met the definitional prerequisite of being a class A multiple dwelling could possibly be regulated. Since the express inclusion of a particular thing implies the omission of others, class B dwellings were not covered (see McKinney’s Cons Laws of NY, Book 1, Statutes, § 240).
The addition of subdivision b did not affect this exclusion. The “other housing accommodations” which could be subject to stabilization were those additional units subject to the city’s declaration of emergency and which met subdivision a’s condition precedent of being a class A multiple dwelling. On this rationale alone it follows that, since the tenant’s room in the present case is in a class B multiple dwelling, it necessarily remained regulation free even after chapter 576 came into existence.
Consistently, it is of more than passing significance that, in a closely analogous context, the Appellate Division upheld the continued nonregulation of co-operative apartments despite subdivision b’s general language. (Minton v Domb, 63 AD2d36 [Evans, J.]; see Conciliation and *80 Appeals Bd Opn No. 2926; Atty Gens Adv Opn No. 488-4220, Dec. 2,1975 [each finding that subdivision b did not negate subdivision a’s exclusion of co-operatives]). The similarity between the two cases derives from the fact that just as a multiple dwelling’s class A status is a condition precedent to rent stabilization law coverage, so too is not being a co-operative. The Appellate Division thus logically found that subdivision b had no effect on subdivision a of section YY51-3.0’s preconditions for regulation.[9]
It therefore would be a mistake to assume that our decision in Axelrod v Starr (41 NY2d 942, affg 52 AD2d 232, supra) is to the contrary. The focus there was not on subdivision a of section YY51-3.0’s exclusions (housing units not covered because definitionally excepted), but rather on exemptions (housing units which meet the statutory conditions precedent to regulation, but are, as an act of legislative grace, nonetheless excepted) (cf. Matter of Grace v State Tax Comm., 37 NY2d 193, 196). Axelrod simply stands for the proposition that to the extent that an enumerated exception to stabilization in section 5 of the ETPA applied, “it should supersede pre-existing exemptions” Axelrod v Starr, supra, p 235).
On all the foregoing — the antecedent history of rent regulation in New York City, the particular provisions of the 1969 and 1974 legislation to which we have alluded, the regulatory housing environment in which these statutes were born, the external and internal evidences of legislative intent which we have noted — we conclude that if we are to enforce the law rather than to write it, to fulfill our duty to adjudicate rather than to legislate, the order of the Appellate Division should be affirmed.

. Still later, in 1971, when the Vacancy Control Law, which decontrolled apartments as they were vacated by existing tenants was instituted (L 1971, ch 371, § 6), the rising tide of rents was to become even more widespread.

. For an informative discussion of the regulatory differences between rent control and rent stabilization, see this court’s opinion in 8200 Realty Corp. v Lindsay (27 NY2d 124, supra).

. The complete text of subdivision a of section YY51-3.0 follows:
“This law shall apply to class A multiple dwellings not owned as a cooperative or as a condominium, containing six or more dwelling units which:
“a. were completed after February first, nineteen hundred forty-seven, except dwelling units (1) owned or leased by, or financed by loans from, a public agency or public benefit corporation, (2) subject to rent regulation under the private housing finance law or any other state law, (3) aided by government insurance under any provision of the National Housing Act, to the extent this local law or any regulation or order issued thereunder is inconsistent therewith, or (4) located in a building for which a certificate of occupancy is obtained after March tenth, nineteen hundred sixty-nine; or (5) any class A multiple dwelling which on June first, nineteen hundred sixty-eight was and still is commonly regarded as a hotel, transient hotel or residential hotel, and which customarily provides hotel service such as maid service, furnishing and laundering of linen, telephone and bell boy service, secretarial or desk service and use and upkeep of furniture and fixtures”.

. It is undisputed that, in the present case, the tenant’s apartment was within the embrace of this legislation.

. Although McKinney’s Session Laws of New York, 1974, states that chapter 576 was passed after a gubernatorial message of necessity and by citing the relevant New York constitutional and statutory home rule provisions (NY Const, art IX, § 2, subd [b], par [2]; Legislative Law, § 55 [cited incorrectly as § 44]) implies that New York City specifically requested the legislation, it would appear that the Governor in fact certified the necessity of the legislation in order to permit the bill to be voted immediately, rather than waiting three days as would otherwise be required by section 14 of article III of the Constitution (see Public Papers of Governor Malcolm Wilson, 1973-1974, pp 439-440). The absence of any “home rule” message in the Legislature’s bill jacket confirms this view.

. The counties to which the act is applicable are Nassau, Westchester and Rockland (ETPA, §14).

. This amendment was only to take effect if the city declared an emergency and sought to make the ETPA applicable to it. Such a State statute apparently was required to actually implement the changes in the city’s RSL of 1969 because the vacancy decontrol laws had left the city powerless to subject any housing accommodation to more stringent regulation than that existing in 1971.

. The power of the Rent Stabilization Association is also circumscribed in the vital respect that it is not the association, but the Rent Guidelines Board, an independent city agency each of whose members must be a housing, finance or economics expert, which annually establishes the maximum levels for which fair rent increases, if any, may be allowed (see Administrative Code, § YY51-5.0, subd a; subd b, par [3]).

. In this setting, however, we observe that subdivision a’s requirement that the accommodation be in a post-1947 building no longer need always be met. In Matter of Zeitlin v New York City Conciliation & Appeals Bd. (46 NY2d 992), in which we treated with an individual unit’s regulatory status, we therefore were able to hold that a rent-controlled apartment in a class A multiple dwelling which became exempt from control was subject to rent stabilization under chapter 576. There was no direct occasion for us to there deal with the issue of whether class B multiple dwellings had become subject to stabilization. It follows that, contrary to what the dissent suggests, the criteria adverted to in our memorandum in that case was applicable to the class of buildings before us then.