# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision
before publication in the New York Reports.

No. 5
In the Matter of Aurora
Associates LLC,
        Appellant,
        v.
Raffaello Locatelli,
        Respondent,
Cleantech Strategies LLC, et al.,
        Respondents.

Joseph S. Goldsmith, for appellant.
Eduardo A. Fajardo, for respondent Raffaello Locatelli.

GARCIA, J.:

Aurora Associates LLC, the owner of Loft 3B at 78 Reade Street in Manhattan,

commenced this holdover proceeding to recover possession and terminate the tenancy of

the current occupant. Summary judgment was granted to the tenant on the ground that

Aurora could not terminate his tenancy because the loft unit was subject to rent

stabilization. We must decide whether a loft unit located in an interim multiple dwelling

covered by the provisions of the Loft Law but exempt from the rent regulation provisions

of that statute by operation of a sale of the prior tenant's rights and improvements is

- 1 -

otherwise subject to rent stabilization.  We hold that it is not, and therefore reverse and grant summary judgment to Aurora.

I.

This case requires us to revisit what we have previously described as a "patchwork of rent-control legislation" that has grown into an "'impenetrable thicket'" of rules and regulations (*City of New York v New York State Div. of Hous. & Community Renewal*, 97 NY2d 216, 219 [2001], quoting *Matter of 89 Christopher v Joy*, 35 NY2d 213, 220 [1974]).  More specifically, in deciding whether the premises here are subject to rent regulation, we must once again consider the interplay of the Emergency Tenant Protection Act (ETPA) and the Loft Law (*see Wolinsky v Kee Yip Realty Corp.*, 2 NY3d 487, 491 [2004]).

The Loft Law, Multiple Dwelling Law article 7-C, was enacted in 1982 to resolve the "serious public emergency . . . created by the increasing number of conversions of commercial and manufacturing loft buildings to residential use without compliance with applicable building codes and laws" (Multiple Dwelling Law [MDL] § 280).  The legislature found that "illegal and unregulated residential conversions" require "intervention of the state and local governments" to "establish a system whereby residential rentals can be reasonably adjusted so that residential tenants can assist in paying the cost of such legalization without being forced to relocate" (*id.*).  The statute's goal was "to finally balance the equities of the conflicting interests in the development and use of loft space" and aimed to "provide[] a framework for the legalization of these

dwellings consistent with the local zoning resolution of the City of New York" (Mem of Legis Rep of City of NY, 1982 McKinney's Session Laws of NY, at 2479, 2484).

To that end, the Loft Law provisions created a pathway to legalization for former commercial and manufacturing loft buildings used as residences despite a lack of residential occupancy certificates pursuant to a process overseen by the Loft Board (*see* MDL § 282). To be eligible for Loft Law occupancy, the building must be an interim multiple dwelling (IMD): a building or structure "at any time occupied for manufacturing, commercial, or warehouse purposes" which "lacks a certificate of compliance or occupancy" and is occupied as a residence by "three or more families living independently of one another" (MDL § 281 [1]). The building must also be "in a geographical area in which the local zoning resolution permits residential use as of right," "within an area designated . . . as a study area for possible rezoning to permit residential use," or subject to a special permit for residential use granted by a local planning agency, and "not owned by a municipality" (*id.* § 281 [2]). Because the intent of the Loft Law was to provide a mechanism for legalizing certain units in commercial buildings already used for residential purposes, not to generate additional illegal conversions, only buildings occupied for residential purposes during certain time periods in the past are eligible for Loft Law conversion (*id.* § 281 [1], [3]). Although occupancy of a multiple dwelling without a certificate of occupancy is generally prohibited by the Multiple Dwelling Law (*id.* § 301), the Loft Law permits "continued occupancy" of converted units in eligible buildings during the legalization process and protects tenants "from

eviction by reason of illegal occupancy, violation of a lease provision prohibiting residential use, or the lack of a residential certificate of occupancy" (*id.* § 283, 286 [1], [2]).

Section 284 of the Loft Law sets out necessary steps for legalization, requiring that owners "take all reasonable and necessary action to obtain a certificate of occupancy as a class A multiple dwelling." Once owners have come into compliance with safety and fire protection standards, they "may apply to the loft board for an adjustment of rent based upon the cost of such compliance," at which point "the loft board shall set the initial legal regulated rent, and each residential occupant qualified for protection . . . shall be offered a residential lease" (*id.* § 286 [3]).

Two provisions of the Loft Law found in a section titled "Tenant protection" are of significance here. Under section 286 (6), "a residential tenant . . . may sell any improvements to the unit made or purchased by [the tenant] to an incoming tenant provided, however, that the tenant shall first offer the improvements to the owner for an amount equal to their fair market value." If the owner purchases the improvements, "any unit subject to rent regulation solely by reason of this article . . . shall be exempted from the provisions of this article requiring rent regulation if such building had fewer than six residential units as of [June 21, 1982] or rented at market value subject to subsequent rent regulation if such building had six or more residential units at such time" (MDL § 286 [6]). A separate provision, often exercised in tandem with a purchase of improvements, provides that "an owner and a residential occupant may agree to the purchase by the

owner of such person's rights in a unit" (MDL § 286 [12]).  Upon purchase of the rights, the owner may return the unit to commercial use, relieving the owner of all Loft Law obligations, or continue residential use, subject to all Loft Law legalization requirements with the exception that "the unit is no longer subject to rent regulation where coverage under [the Loft Law] was the sole basis for such rent regulation" (29 RCNY 2-10).

## II.

In 1998, the prior owner of 78 Reade Street—a building registered as an IMD in 1983—purchased the improvements and rights related to Loft 3B pursuant to MDL § 286 (6) and (12) from the tenants then in occupancy.  The record before us contains the sales record form reflecting the 1998 sale of the then-covered tenant's improvements and rights under MDL § 286 (6) and (12), along with a recent registration renewal notice from the Loft Board indicating that the unit in question is designated "BuyR"—the "designation a unit receives in Loft Board records after a sale of rights has been filed and the unit is intended to remain residential" (Loft Board Order No. 4995 [2020]; Loft Board Order No. 5061 [2021]).[1]  Prior tenants had been paying $440 a month in rent.  By the end of 1998, following Aurora's purchase of the building, Aurora entered into a lease agreement with a new tenant for $4250 per month.

---

[1] The sales record form is to be filed within 30 days of the sale (29 RCNY § 2-10 [b]). The Loft Board has determined, pursuant to 29 RCNY § 2-10 (b), that "[t]he only consequence for [a building owner's] untimely filing of the sales record form is a civil penalty" (Loft Board Order No. 4738 [2018]).

In 2009, the current tenant entered into a lease agreement with Aurora to rent Loft 3B at $4000 per month for a five-year term, and in 2014 the parties agreed to a one-year extension of the lease at an increased rent of $4200 per month. After the one-year extension expired, tenant paid $4200 on a month-to-month basis until February 2016. The following month, Aurora sent tenant a notice of termination requiring him to vacate by the end of April 2016 and rejected tenant's rent payment.

When tenant refused to vacate, Aurora brought a holdover proceeding against tenant pursuant to Real Property Law § 232-a, which authorizes summary proceedings to remove a monthly tenant given appropriate notice, and tenant raised counterclaims in opposition. The parties cross-moved for summary judgment, with tenant arguing that the unit was subject to rent stabilization under the ETPA, independent of the Loft Law. Tenant asserted that therefore he was not a month-to month tenant and instead was entitled to summary judgment dismissing Aurora's possession claim and to renewal of his lease (*see generally* 9 NYCRR pt 2524) because Civil Court "must follow the holding of" *Acevedo v Piano Bldg. LLC* (70 AD3d 124, 127 [1st Dept 2009]), namely that a unit is "subject to rent stabilization by virtue of [the] ETPA" even where a sale of rights has occurred. Aurora, in opposition, asserted that it was not until *Acevedo* that Loft Law units were made subject to the ETPA, that *Acevedo* was "not good law," and that, "if *Acevedo* . . . is not to be enforced, the Premises is not subject to the ETPA since there has

been a prior sale pursuant to MDL § 286 (12)."[2]  This argument prompted tenant to respond that Aurora could not avoid *Acevedo's* holding that the ETPA precluded his eviction "unless the New York State Court of Appeals decline[d] to follow *Acevedo*," and thereby overruled its approach.

As the Housing Court Judge explained, "[t]he core of the parties' dispute is the rent regulatory status of the subject premises" because "[i]f the subject premises is unregulated, termination of a tenancy pursuant to Real Property Law § 232-a is a remedy available to Petitioner," and "[i]f the subject premises is rent-stabilized, RPL § 232-a is not a remedy available to Petitioner."  To answer that dispositive issue, the court looked to the building's "rent regulatory status" under the Rent Stabilization Act of 1969 (RSL) (Administrative Code of City of NY) § 26-511 (c) (4).  Relying on *Acevedo*, the court agreed with tenant that, because "there are six residential units in the building in which the subject premises is located," "it is subject to rent stabilization by virtue of [the ETPA] notwithstanding the sale of Loft Law rights by the prior tenant, in part because MDL 286 [12] only applies to the actual occupant who sold his or her rights, not subsequent tenants."  On this basis, the court denied Aurora's motion for summary judgment on the issue of possession of the unit, granted tenant's motion to dismiss Aurora's petition

---

[2] Given the likelihood that Civil Court would adhere to the controlling Appellate Division precedent on which tenant relied, Aurora also raised arguments contending that, even assuming the Rent Stabilization Act of 1969 (RSL) (Administrative Code of City of NY) § 26-511 (c) (4) and the ETPA applied under *Acevedo*, the unit was nevertheless exempted from such rent regulation schemes pursuant to various provisions within those statutes.

insofar as it sought possession of the unit, and granted Aurora's motions to dismiss tenant's rent overcharge and attorneys' fees counterclaims.

The parties cross-appealed to the Appellate Term, which granted tenant's cross motion for attorneys' fees and otherwise affirmed (57 Misc 3d 157[A] [App Term, 1st Dept 2017]). The Appellate Term echoed Housing Court's statement that "[t]he 'core' of the parties'[] dispute, as acknowledged by the motion court itself, was the rent regulatory status of the subject unit, which resulted in the dismissal of *the underlying holdover proceeding* on the merits" (*id.* at *3 [emphasis added]). That court held that Aurora could set a market value rent pursuant to MDL § 286 (6), but—citing *Acevedo*—determined that the loft nevertheless remained subject to rent regulation, as a "pre-1974 building [that] contained six or more residential units and the unit remained residential" (*id.* at *1). Because it determined tenant had received "substantial relief" in the holdover proceeding, the court remitted for a determination of attorneys' fees in tenant's favor (*id.*).

The Appellate Division affirmed the Appellate Term order, also relying on *Acevedo* to hold that "[n]otwithstanding the predecessor owner's purchase of a prior tenant's rights under Multiple Dwelling Law § 286 (12), the loft unit at issue remained subject to rent regulation as the apartment is located in a pre-1974 building containing six or more residential units" (184 AD3d 436, 437 [1st Dept 2020]). As a result, the Appellate Division determined that the eviction proceeding was properly dismissed (*id.* at 437). The Appellate Division also affirmed dismissal of tenant's rent overcharge claim, asserting that Aurora "was not entitled to charge a market value rent for the unit" but

tenant's overcharge claim failed nonetheless because there was no basis to examine the

rental history beyond the four-year lookback period (*id.*). That court granted Aurora's

motion to appeal to this Court, certifying the question of whether its order was correctly

decided.[3]

Before this Court, Aurora argues that Loft 3B is not subject to rent regulation due

to the prior owner's purchase of the protected tenant's Loft Law rights. Aurora contends

that the courts below erred in concluding that the unit was otherwise subject to rent

stabilization and eviction protections by operation of the ETPA and RSL and that such a

conclusion contravenes this Court's decision in *Wolinsky*. In response, tenant argues that,

irrespective of Loft Law coverage and the prior tenant's Loft Law sale of rights, the unit

is subject to rent stabilization pursuant to the ETPA as a "housing accommodation"

because the building was constructed prior to 1974, contains more than six residential

units, and Loft Law units are not expressly exempted from ETPA coverage.[4] We must

therefore decide whether Loft 3B was subject to rent regulation "solely" by virtue of the

---

[3] The Appellate Division denied tenant's motion for leave to appeal to this Court and we dismissed tenant's subsequent motion for leave on jurisdictional grounds (36 NY3d 1105 [2021]). As a result, tenant's overcharge claim is not before us on this appeal.

[4] Tenant has never asserted that he was a "residential occupant[] qualified for protection" and "entitled to continued occupancy" under MDL § 286 (2) (i) (dissenting op at 12-15). At oral argument before this Court, tenant conceded that the sole issue here is whether rent control protections apply to prevent Aurora's Real Property Law § 232-a action from proceeding, and argued that the ETPA was "what protects this particular tenant" from Aurora's holdover action seeking possession of the unit. Tenant also conceded that in the proceedings below, he never claimed protection from any other statutory source.

relevant provisions in the Loft Law such that, after the sale of the tenant's rights under section 286 (12), it was no longer subject to any form of rent regulation. To answer that question, we must consider the other potential avenue for rent regulation on which tenant relies—the RSL and the ETPA.

III.

The ETPA, enacted to eliminate vacancy decontrols, is an "enabling act" that empowered New York City, among other municipalities, "to extend rent stabilization" to "all or any class or classes of housing accommodations" with some enumerated exceptions (*La Guardia v Cavanaugh*, 53 NY2d 67, 71 [1981]; Unconsolidated Law § 8625). Pursuant to the ETPA, upon New York City's invocation of its authority, certain housing accommodations became subject to the RSL (*see also Matter of Salvati v Eimicke*, 72 NY2d 784, 791 [1988]; *La Guardia*, 53 NY2d at 76).

The RSL and the regulations promulgated thereunder in the Rent Stabilization Code [RSC] apply to "Class A multiple dwellings" containing six or more units and built before 1974, with the exception of units "subject to rent regulation under the private housing finance law or any other state law" and "[o]ther housing accommodations in class A or class B multiple dwellings made subject to this law pursuant to the [ETPA]" (NYC Admin Code § 26-504 [a] [1] [b], [b]). The RSC specifies its applicability to any class or classes of "housing accommodations"—defined as "[t]hat part of any building or structure, occupied or intended to be occupied by one or more individuals as a residence, home, dwelling unit or apartment" (9 NYCRR 2520.6 [a])—"made subject to regulation

pursuant to the [RSL] or any other provision of law" but, as discussed further below,

excepts from its coverage "housing accommodations which would otherwise be subject

to rent regulation solely by reason of the provisions of article 7-C of the MDL requiring

rent regulation, but which are exempted from such provisions pursuant to section 286 (6)

and 286 (12) of the" MDL (9 NYCRR 2520.11 [q]).

Despite the breadth of its purported reach, the extension of rent stabilization

pursuant to the ETPA is not unlimited, as we made clear in *Wolinsky*, a case involving

tenants who sought ETPA protection for units converted from commercial to residential

use outside the Loft Law eligibility period (2 NY3d at 487, 493).[5]  In addressing tenant's

claim for protection, we held that the ETPA did not apply to the converted units, because

"[i]f the prior-enacted ETPA already protected illegal residential conversions of

manufacturing space, significant portions of the Loft Law would have been unnecessary"

(*id.* at 493).  While "not expressly exempted from ETPA coverage," we noted that "the

Legislature did not view the ETPA as safeguarding the interests of the loft pioneers" and

concluded that the tenants' illegal conversions did "not fall under the ambit of the ETPA"

(*id.* [internal quotations omitted]).

---

[5] Our conclusion in *Wolinsky* that the ETPA did not apply to illegally converted lofts despite its facially broad application to "housing accommodations" is consistent with our prior determination in *La Guardia* that the term "housing accommodation," as added to the RSL in conjunction with the enactment of the ETPA, did not encompass class B multiple dwellings (*see* 53 NY2d 67 at 76).  In response to *La Guardia*, the legislature extended the Rent Stabilization Law to specifically encompass class B multiple dwellings (*see* L 1981, ch 675).

Some lower courts have disagreed over the impact of our holding in *Wolinsky* on the issue of whether the ETPA applies to loft units that do qualify for Loft Law coverage. The First Department has held that, regardless of a sale of rights or improvements under MDL § 286, premises subject to the Loft Law are and remain subject to rent regulation under the ETPA, as long as the unit in question is in a building with six or more units constructed before 1974 (*see Acevedo*, 70 AD3d 124). In *Acevedo*, relied on by the courts below, the First Department based its holding on the language of Loft Board regulation 2-10, which provides that following a sale of rights, a unit is "no longer subject to rent regulation where coverage under Article 7-C was the *sole* basis for such rent regulation" (29 RCNY 2-10 [emphasis added]). The court expressed the view that "the only other 'such rent regulation'" to which the Loft Board's regulation could have been referring is the ETPA and reasoned from that premise that there would have been "no reason for the phrase in the regulation referring to 'the sole basis for such rent regulation,'" unless there was ETPA coverage. Thus, without clearly identifying a basis for coverage in the language of the ETPA or RSL, the court concluded that the Loft Board somehow acknowledged that—independent of the provisions of the Loft Law—"a former Loft Law unit may be covered by rent stabilization" under the ETPA (*id.* at 128 [internal quotation marks omitted]). The First Department took the "view" that *Wolinsky* "stands for nothing more than the proposition that illegal loft units are not entitled to rent stabilization treatment when the unit is incapable of being legalized" (*id.* at 130).

In contrast, the Second Department has relied on our holding in *Wolinsky* to limit the reach of ETPA protections, for example holding that, in situations where "conversion of the unit was undertaken at the expense of [tenant's] predecessor, who then sold his fixtures and his Loft Law rights to the defendant's predecessor," tenant's "premises were not covered by, and his tenancy was not protected by, the ETPA," and it was error to find the tenancy "subject to rent regulation" (*Bennett v Hawthorne Vil.*, 56 AD3d 706, 709-710 [2d Dept 2008]). The Second Department has thus declined to adopt the interpretation that the ETPA automatically applies, following a sale of Loft Law rights, to any building with six or more units constructed before 1974 that is capable of being legalized.

We reject the First Department's view of the limited applicability of our holding in *Wolinsky* and, consistent with our analysis in that case, we now hold that a unit covered by the Loft Law, exempted from that statute's rent stabilization regime by operation of a sale of a prior tenant's rights and improvements, is not subject to the rent stabilization provisions of the ETPA. As we held in *Wolinsky*, illegal loft conversions are not covered by the ETPA. It follows that conversions made legal solely by operation of the Loft Law, that obtain relief from that statute's rent regulation regime pursuant to its provisions, do not default to rent stabilization under the ETPA (*see* 2 NY3d at 493, *Caldwell v Am. Package Co.*, 57 AD3d 15, 20-24 [2d Dept 2008]). Accordingly, our holding confirms that illegal conversions do not independently fall within the ambit of the ETPA, whether or not the unit may ultimately find a path to legalization through the Loft Law.

To the extent that some courts have relied on language in the Loft Board regulations referring to instances where the Loft Law was the "sole basis" for rent regulation as support for applying the ETPA to units subject to the Loft Law (*see Acevedo*, 70 AD3d at 128 [2008]), such reliance is misplaced. The regulatory language in question does not refer to the application of another rent regulation regime or suggest that a Loft Law unit may be independently subject to rent regulation under the ETPA. Rather, the "sole basis" language, which appears in similar form in the Loft Law and Rent Stabilization Code (*see* MDL § 286 [6]; 9 NYCRR 2520.11 [q]), merely reflects recognition of the fact that the legislature has periodically created tax incentive and other programs through which non-stabilized units become (sometimes temporarily) subject to rent stabilization. Whether or not there is an applicable program covering a particular unit at any given point in time, this language provides room for the legislature to expand the scope of rent stabilization to encompass such a unit, and clarifies that a unit that became subject to rent stabilization based on a separate law would not be exempt therefrom merely because it met the exemption criteria of the Loft Law. Consistent with this view, the Loft Board's regulation governing the purchase of improvements recognizes that some units may be receiving certain benefits of real estate tax exemption or tax abatement that otherwise render them rent-stabilized, and explains that the Loft Law sale provisions do not abrogate other rent stabilization regimes as applied to those units (*see* 29 RCNY § 2-07 [d] [2]).

Furthermore, by its own terms, the ETPA—which permitted municipalities to extend rent stabilization to "all or any class or classes of housing accommodations"

(Unconsolidated Law § 8625 [a])—does not cover this unit.  The RSL, effectuating the

ETPA, covers "housing accommodations in class A or class B multiple dwelling units

made subject to [the RSL] law pursuant to the [ETPA]" (RSL § 26-504 [b]; *see Matter of*

*Gracecor Realty Co., v Hargrove*, 90 NY2d 350, 355 [1997]).  A unit undergoing Loft

Law legalization does not constitute a "housing accommodation in [a] class A . . .

multiple dwelling" within the meaning of the RSL.  In fact, to be eligible for Loft Law

coverage, a unit must constitute an IMD, and the end goal of the Loft Law legalization

process is certification as a class A multiple dwelling (MDL § 284).  And the RSC

specifically excludes from coverage "housing accommodations which would otherwise

be subject to rent regulation solely by reason of the provisions of [the Loft Law]

requiring rent regulation, but which are exempted from such provisions pursuant to

sections 286 (6) and 286 (12) of the MDL" (RSC § 2520.11 [q]; *see* 9 NYCRR 2520.6 [a]

[defining "housing accommodation"]).[6]

---

[6] Our dissenting colleague raises an issue—ostensibly "for another day"—that has neither
been briefed by any party nor considered by any court below, nor indeed by any court to
have considered the issue we decide (dissenting op at 21 n 7).  That this circular
argument has so far gone unmentioned is not surprising.  The EPTA is, of course, an
enabling act, "not a rent and eviction regulating law" (*see Laguardia*, 53 NY2d at 74-75),
and where invoked by New York City, it is the Rent Stabilization Law and the Code that
define the reach of stabilization.  That code specifically exempts these lofts from
coverage (*see* 9 NYCRR 2520.11 [q] [exempting from rent regulation housing
accommodations otherwise subject to rent regulation "which are exempted . . . pursuant
to sections 286(6) and 286(12) of the MDL"]).

The Loft Law provides a detailed process for converting commercial space that had been unlawfully occupied as a residence to lawful residential use.  Section 286 of that law provides a mechanism for tenants to recoup costs of improvements and for landlords to purchase tenants' improvements and rights. [7]  Upon doing so, landlords obtain relief from rent regulation under the Loft Law.  However, occupancy of the unit is still governed by the Loft Law and the unit remains subject to all the relevant compliance provisions and deadlines.  By its terms, the regulation provides that following a sale of rights, where a unit is to remain residential, "the owner remains subject to all of the requirements of Article 7-C, these rules and orders of the Loft Board, including the legalization requirements of MDL § 284" (29 RCNY 2-10).  As a result, there remains in place a system of requirements and deadlines with which the owner must comply, and penalties to which the owner is subject in the event of noncompliance.  Here, the prior owner purchased rights and improvements in a particular unit in this Loft Law-eligible building, removing that unit from the Loft Law's rent regulation provisions, entitling Aurora to charge a market rent and, pursuant to Real Property Law § 232-a, to regain possession of the apartment by means of a holdover proceeding.

---

[7] We also reject the First Department's interpretation of the deregulation effect of section 286 (12) as somehow inapplicable to subsequent tenants.  There is no support for that determination in the language of the statute and such an approach would contravene the statute's purpose (*see* Loft Board Order No. 4738 [the unit was "deregulated by a prior sale of rights. Thus, Tenant is not a protected occupant"]; Loft Board Order No. 4227 [2014]).

While the tone of the dissent is regrettable, the main thrust of the "analysis" requires little attention. As the procedural history outlined above makes quite clear, this dispute from its inception has concerned whether the unit was rent stabilized, as the determinative factor in deciding whether Aurora could proceed under the relevant provision of the Real Property Law on which this holdover action was based. That was the issue decided by Housing Court, by the Appellate Term, and by the Appellate Division, and it is the issue pressed by tenant in this Court. The suggestion that the only relevance of the rent stabilization issue was to tenant's counterclaim (dissenting op at 4, 13) is wrong. In fact, tenant below claimed that Aurora could only win on its holdover claim if "the New York Court of Appeals declines to follow *Acevedo*" (*but see* dissenting op at 29 ["The majority now overrules the very authority on which *Aurora* affirmatively relied"] [emphasis added]). We now do just that. [8]

Accordingly, the Appellate Division order, insofar as appealed from, should be reversed, with costs, respondent's cross motion for summary judgment dismissing the petition denied, petitioner's motion for summary judgment granted, the matter remitted to the Civil Court of the City of New York for further proceedings in accordance with this opinion, and the certified question answered in the negative.

---

[8] We do not approach statutory interpretation as a competition with the legislature over who gets the "last word" (dissenting op at 33-34).

WILSON, J. (dissenting):

If one ignores some simple facts agreed to by both parties and disregards the text

and purpose of the Loft Law, it is easy to become ensnared, as the majority has, in an

"impenetrable thicket" (majority op at 2 [quoting *89 Christopher, Inc. v Joy*, 35 NY2d 213,

220 (1974)]). Although other cases involving New York City's rent regulation scheme may be complex, this is not one of them. Or, at least, it should not have been one.

These are the simple, agreed upon facts:

- The parties confirmed at oral argument that the sole issue presented is whether Aurora can evict Mr. Locatelli.

- The owner of 78 Reade Street registered that building under the Loft Law for conversion to residential occupancy in 1983. In those 39 years, I finished law school, clerked for a federal judge, worked as a commercial litigator for more than 30 years and as a Judge of this Court for the last five; meanwhile Aurora and its predecessors have not obtained a residential certificate of occupancy for 78 Reade Street, and offer no explanation for that failure.

- Absent extensions based on a showing of good cause, the Loft Law required the owner of 78 Reade Street to obtain a certificate of occupancy within roughly three years of registration—that is, by 1986 or 1987.

- Aurora, the owner since 1998, admits that it cannot legally collect rent from *any* of the residential tenants of that building, including Mr. Locatelli, because it has not complied with the Loft Law requirements within the prescribed time periods or qualified for any extension of those deadlines.

- Nevertheless, Aurora has collected market-rate rents for Unit 3B, the subject unit —ranging between $3,300 to $4,250 a month—from 1998 until 2016, when Aurora

refused Mr. Locatelli's tender of his monthly rent and commenced this eviction proceeding.[1]

As to its text and legislative purpose, the Loft Law prevents the displacement of tenants residing in former commercial or industrial buildings that lack residential certificates of occupancy; provides specialized rent regulation during the approximately three-year period during which owners take steps necessary to bring the loft units in compliance with fire, health and safety standards and obtain a certificate of occupancy ("C of O"); and permits owners of those buildings to collect rents from their residential tenants *so long as the owner has met the timelines for residential legalization* set forth in the Loft Law. New York City's implementing regulations provide that if an owner purchases a tenant's rights pursuant to MDL § 286 (12), the Loft Law's own *rent regulation* provisions do not apply, but all other Loft Law requirements do (29 RCNY § 2-10 [d] [2]). Those other requirements include the Loft Law's anti-eviction protections.

After entering the impenetrable thicket, the majority exits with the following answer: Aurora's purchase of rights from a prior tenant of Mr. Locatelli's unit removed the unit from the Loft Law's rent regulation, and because the building (and unit) remains subject to the rest of the Loft Law's requirements, the building is not subject to any

---

[1] Aurora's noncompliance with the Loft Law has proved quite lucrative. Aurora has redacted from the record the amount it paid to purchase previous tenants' rights in Unit 3B, but it has provided detailed data showing that it received nearly $300,000 in rent from the successor tenant, and approximately that same amount from Mr. Locatelli—all of which it could not legally have collected. In addition to Unit 3B, 78 Reade Street has seven other residential units.

provisions of the Emergency Tenant Protection Act, including the ETPA's provisions barring eviction. Therefore, Aurora is entitled to summary judgment in its holdover proceeding to evict Mr. Locatelli.

My answer, found clearly in the statutory text, is different: By failing to comply with the Loft Law's conversion requirements, Aurora (and its predecessors) lost the benefits of that law. Aurora's noncompliance, however, does not strip Mr. Locatelli of his right to remain. Housing Court, the Appellate Term and the Appellate Division each concluded that Aurora may not evict Mr. Locatelli. Only the majority believes Aurora may do so, and it believes so based on a rationale not advanced by—but incompatible with— the argument made by Aurora in Housing Court.

Despite acknowledging that the Loft Law governs Unit 3B, the majority focuses its analysis on the unit's rent-regulatory status under Emergency Tenant Protection Act ("ETPA"). That is an analytical misstep. Answering any question about whether Unit 3B is subject to rent regulation, either now or in some imaginary future in which 78 Reade Street obtains a residential certificate of occupancy, is purely advisory. Although it made sense for the lower courts to consider Unit 3B's rent regulatory status because Mr. Locatelli's rent overcharge claim was at issue, we dismissed Mr. Locatelli's application for leave to appeal his rent overcharge claim (36 NY3d 1105 [2021]), and Aurora has not sought any monetary remedy from Mr. Locatelli. In fact, before our Court, Aurora admitted it cannot legally collect rent for any unit at 78 Reade Street, including Mr. Locatelli's, until it complies with the Loft Law, a result dictated by our decision in *Chazon v Maugenest* (19 NY3d 410 [2011]). Thus, the only question for our Court to decide on

this appeal is whether Aurora can evict Mr. Locatelli, and the Loft Law provides the answer to that question in full. There is no need to consult any other statutory framework.

I briefly explain the history of the Loft Law in Part I. In Part II, I set out the essential procedural history of this case. In Part III, I explain why the Loft Law alone resolves this case and bars Mr. Locatelli's eviction. One could stop there and have a completely sufficient answer to resolve this appeal. However, in Part IV, I reluctantly enter the majority's briar patch to explain why, even there, the majority has gone astray. Part V expresses my bemusement at the majority deciding this case based on a ground not advanced by and incompatible with the argument made by Aurora in the court of instance, in contravention of its recent insistence that we consider only those arguments raised by the parties.

I

At the behest of New York City, in 1982, the Legislature passed the Loft Law to address the "serious public emergency" of such a lack of affordable housing that persons were taking up residence in commercial and manufacturing spaces that did not conform to residential housing codes (MDL § 280). The Loft Law was the "sixth and final integral and interrelated component of [Mayor Koch's] comprehensive plan for the utilization of loft space in New York City" (Letter from Mayor Edward I. Koch to Governor Hugh L. Carey, June 10, 1982). The Legislature found that the then-existing state of loft occupancy posed a "serious public emergency" for "public health, safety and general welfare" because

"housing maintenance services essential to maintain health, safety and fire protection are not being provided in many such buildings" (MDL § 280). Before enacting the Loft Law, the legislature had enacted Article 7-B "to facilitate the compliance by owners with necessary fire safety provisions," but Article 7-B had "not been effective because of the lack of a framework for the legalization of loft space used illegally for residential purposes" (Letter from Mayor Koch to Governor Carey, June 10, 1982, at 8). Mayor Koch explained that the Loft Law would "assure that fire safety standards are met in these buildings at the earliest possible moment" (*id.*). Through the Loft Law, the Legislature struck a balance between those grave public safety issues, on the one hand, and the "acute shortage of housing" in New York City and "great hardship" tenants would suffer if those buildings were immediately barred to residential occupants (*id.*).

The Loft Law provides a statutory framework to convert such formerly commercial spaces already occupied by residential tenants into official residential spaces in compliance with NYC fire, safety and health regulations. The Loft Law defines an "interim multiple dwelling" or "IMD" (MDL § 281). The Loft Law originally obligated owners of IMDs to:

> "[A] file an alteration application within nine months [of June 21, 1982] . . . [B] take all reasonable and necessary action to obtain an approved alteration permit within twelve months [of June 21, 1982] . . . [C] achieve compliance with the standards of safety and protection . . . within eighteen months from obtaining such alteration permit or eighteen months from such effective date, whichever is later, and . . . [D] take all reasonable and necessary action to obtain a certificate of occupancy as a class A multiple dwelling for the residential portions of the building or structure within thirty-six months from [June 21, 1982]"

(MDL § 284 [1] [i]).[2]

For an IMD registered with the Loft Board, while the unit is being brought up to code and a C of O is being obtained, the Loft Law allows tenants to live in the unit even though it lacks a residential C of O (MDL § 283) and it allows landlords to collect rent (MDL § 285 [1])—conduct that would otherwise be prohibited by sections 301 and 302 of the Multiple Dwelling Law (*see* MDL § 301 [1] [illegal for a tenant to live in a unit without a CO]; MDL § 302 [1] [b] [illegal for a landlord to charge rent for a unit without a C of O]).  As we summarized in *Chazon, LLC v Maugenest*: "Until the Legislature enacted the Loft Law in 1982, the residential occupancy of lofts was illegal pure and simple: The tenants had no right to be there, and the landlords had no right to collect rent" (19 NY3d 410, 413 [2012] [citation omitted]).[3]

---

[2] Subsequent amendments extended the deadlines for deemed compliance.  The last such amendment would deem an owner in compliance if the owner had filed an alteration application by September 1, 1999; had taken all reasonable and necessary steps to obtain an approved alteration permit by March 1, 2000; had complied with the fire and safety standards by May 1, 2002 or 12 months from obtaining an approved alteration permit; and had taken all reasonable and necessary action to obtain a certificate of occupancy as a class A multiple dwelling by May 31, 2002 or within one month of achieving compliance with the prior requirements, whichever is later (MDL § 284 [1] [iv]).  Additionally, the Loft Law permits the Loft Board to grant up to two 12-month extensions of the deadline to obtain a certificate of occupancy "upon good cause shown, and upon proof of compliance with the standards of safety and fire protection" (*id*. § 284 [1] [v]).  The statutory and discretionary extension provisions are not relevant here, because Aurora admits that 78 Reade Street remains out of compliance to this date.

[3] The Loft Law allows tenants of an IMD to register a building with the Loft Board.  If neither the owner nor the tenant registers the IMD, no legal residential rental of, or tenancy in, the building is allowed until the owner obtains a residential C of O for the building.  In other words, owners have an incentive to register IMDs to be able to collect rents while

Upon registration with the Loft Board, an IMD owner must meet the statutory timelines for completion of the work set out in MDL § 284 and described above. Units that go through the conversion process have their preexisting rents frozen with modest increases allowable after schedules are met, including when an alteration application is filed, when an alteration permit is issued, and when fire safety standards are met (MDL § 286 [2] [ii]). Once an owner complies with all the legalization requirements of the Loft Law and obtains a C of O, the Loft Board sets the initial rent (MDL § 286 [5]) and then turns its jurisdiction over to the New York Division of Housing and Community Renewal ("DHCR") for normal stabilized rent regulation (29 RCNY § 2-01 [m]; *see also* Letter from Mayor Koch to Governor Carey, June 10, 1982, at 5 ["The loft board would set the initial legal regulated rent of each residential unit which would then be subject to the Rent Guidelines Board increases pursuant to the Emergency Tenants Protection Act"]).

II

Unit 3B is on the third floor of 78 Reade Street, a former commercial building. On January 31, 1983—well within the original statutory deadline for registering with the Loft Board—the building's owner, Elan-Volcan Associates, filed with the Loft Board an IMD Application for the building. When the Loft Board accepted the application a few months

they legalize the building for residential use, and tenants have an incentive to register the building to obtain protection against eviction, rents regulated by the Loft Board during the legalization process, and compensation for tenant improvements to the units in which they have been dwelling, among other things.

later, the unit became subject to the Loft Law and the City's implementing regulations, including the statutory schedule for bringing the unit up to code.

But in 1997, fourteen years later, Unit 3B still did not have a residential C of O. Nevertheless, William and Helena Lombardi were living there and paying $440.16 per month in rent to the building's owner, Reade-Church Equities Associates. By an agreement dated August 5, 1997, the Lombardis agreed to vacate Unit 3B and sell to Reade-Church Equities, all leasehold improvements and rights, including rights under Multiple Dwelling Law § 286 (12), and to surrender possession of the premises for a sum of money that has been redacted from the record. The agreement also represented that that Unit 3B is a "loft premises . . . covered under the Loft Law" and that, after the sale, the Lombardis "shall no longer be deemed a covered Tenant under the Loft Law." A sale form signed by Mr. Lombardi dated August 26, 1998 memorializes that transaction. The sale form indicates that the building has eight residential units at the time of the sale and that Unit 3B was intended to remain in residential use after the sale. A month earlier, by deed dated June 30, 1998, Reade-Church Equities transferred ownership of the building to Aurora Associates. The record shows that Reade-Church and Aurora are affiliated entities.

In December 1998, Aurora leased Unit 3B to a new tenant for $4,250 per month. The unit still had no residential C of O. The tenant's rent was reduced to $3,800 in January 2002 and $3,300 in January 2004, and the tenant moved out in July 2004. The record does not show whether the unit was rented between July 2004 and July 2009.

On August 1, 2009, Aurora still had not brought the unit up to code or obtained a residential C of O. Nevertheless, it entered into a lease with the tenant in this case, Mr.

Locatelli, for Unit 3B and charged rent of $4,000 per month. Mr. Locatelli paid that rent for five years, after another which he entered into a one-year lease extension with Aurora, at an increased rent of $4,200 per month, which extension took effect as of December 1, 2014. That lease expired on November 30, 2015, and Mr. Locatelli continued to pay the monthly rent charged by Aurora, which Aurora accepted through February 2016. On March 23, 2016, Aurora sent Mr. Locatelli a notice of termination of month-to-month tenancy, requiring him to vacate by April 30, 2016 and threatening legal action. Aurora subsequently rejected rent Mr. Locatelli tendered. Throughout the entire period during which Mr. Locatelli paid rent to Aurora, the unit had no residential C of O.

On May 5, 2016, Aurora commenced this holdover proceeding. Mr. Locatelli answered, generally denying the allegations in the petition and asserting as an affirmative defense that despite Aurora's purchase of "the fixtures of a prior Loft Law tenant," the petition should be dismissed because Aurora "never obtained a final Certificate of Occupancy and simply continued renting the subject premises for residential purposes." He also challenged the validity of the purported sale of rights by the Lombardis on the ground that Loft Board regulations required that documentation of the sale of rights be filed with the Loft Board within 30 days (29 RCNY § 2-10 [b]), and Aurora had not filed it with the Loft Board until six years after the purported sale occurred. He also asserted counterclaims for rent overcharges and attorneys' fees.

Housing Court denied Aurora's motion for summary judgment of possession, rejecting Aurora's argument that because the rent charged to the first tenant after the MDL § 286 (6) and (12) sale was over the luxury decontrol threshold of $2,000, the unit

was not regulated. Housing Court granted Mr. Locatelli's cross-motion for summary judgment denying the petition for possession and denied his counterclaims. Housing Court noted Mr. Locatelli's argument about the invalidity of the § 286 (6) and (12) sale based on (1) untimeliness of the filing with the Loft Board and (2) the fact that the purported sale was signed by only one of the two tenants protected by the Loft law. Housing Court did not reach either argument because it ruled for Mr. Locatelli on other grounds.[4] The Appellate Term modified to grant Mr. Locatelli attorneys' fees, holding that he was the "prevailing party," and otherwise affirmed Housing Court's judgment (57 Misc 3d 157[A] [App Term, 1st Dept 2017]).

The Appellate Division affirmed (184 AD3d 436 [1st Dept 2020]). First, it held that notwithstanding the MDL § 286 (12) sale, Unit 3B remained subject to rent regulation under the ETPA because the apartment is located in a pre-1974 building containing six or more residential units, and thus the eviction proceeding was properly dismissed (*id.* at 437). Next, the Appellate Division held that the Appellate Term properly awarded attorneys' fees to Mr. Locatelli because he was the prevailing party on the "core" issue between the

---

[4] Because that properly raised issue, which involves both facts and law, has never been decided, even accepting the majority's judgment in its entirety, the order here should be a remittal for determination of at least that issue, not an order directing a grant of summary judgment for Aurora. The majority refers to a Loft Board determination that failure to timely file a sale of rights results in a civil penalty only (majority op at 5 n 1), but that question is ultimately one of statutory interpretation for the lower courts to decide in the first instance. Here, Housing Court expressed some concern about the consequences of allowing the delinquent filing to be given effect. Mr. Locatelli raised the issue in the court of instance, and no court has considered the issue. Our normal practice is to remit such issues for decision by the lower courts.

parties" (*id*.). Finally, the Appellate Division held that the Appellate Term properly dismissed the rent overcharge claim (*id*.). A few months later, the same panel denied Aurora's cross-motion for reargument and certified the question of whether its order was correctly decided to our Court.

## III

## A

78 Reade Street and Unit 3B within it are subject to the Loft Law. When Aurora commenced this proceeding, it pleaded that "(t)he Premises is an Interim Multiple Dwelling, subject to Article 7-C of the New York Multiple Dwelling Law ('Loft Law')." Aurora presently maintains Unit 3B's IMD status by submitting an annual registration form and an annual $500 registration fee to the Loft Board. Despite the Loft Law's requirement that the owner of an IMD speedily obtain a residential C of O, Aurora (and the preceding owners) have never obtained one. Without a residential C of O, once Aurora fell out of compliance with the Loft Law's statutory schedule for bringing the unit up to code, it became illegal for Aurora to collect rent until the unit is legalized (MDL §§ 301, 302 [1] [b]; *see also Chazon v Maugenest*, 19 NY3d 410, 413 [2011]).

Aurora does not contend that its failure to comply with the Loft Law's legalization requirements entitles it to evict Mr. Locatelli. Not only does the Loft Law forbid owners from seeking to recover possession of a unit "because a residential certificate of occupancy has not been issued for the building" (MDL § 286), but it expressly grants tenants the right to remain throughout the legalization process:

> "Prior to compliance with safety and fire protection standards of article seven-B of this chapter, residential occupants qualified for protection pursuant to this article shall be entitled to continued occupancy, provided that the unit is their primary residence, and shall pay the same rent, including escalations, specified in their lease or rental agreement . . . or, in the absence of a lease or rental agreement, the same rent most recently paid and accepted by the owner"

(MDL 286 § [2] [i]).  Then, "[u]pon or after compliance with the safety and fire protection standards . . . each residential occupant qualified for protection pursuant to this article shall be offered a residential lease subject to the provisions regarding evictions and regulation of rent set forth in the [ETPA] . . . except to the extent the provisions of this article are inconsistent with such act" (*id.*).  By the plain terms of the Loft Law, Mr. Locatelli is entitled to continued occupancy.  In fact, the Loft Law provides Aurora with no grounds to terminate Mr. Locatelli in a holdover proceeding.  Again, this case is not about whether Mr. Locatelli's rent is regulated: Mr. Locatelli's rent overcharge claim, which was at issue in the lower courts, is not before our Court.  Aurora agrees it cannot legally charge him any rent—the issue on appeal is solely Mr. Locatelli's right to stay.

B

The MDL § 286 (6) and (12) sale did not divest the Loft Board of jurisdiction over the legalization process.  The majority agrees with at least that (majority op at 16).[5]

---

[5] An owner has two choices after an MDL § 286 (12) sale: return the space to commercial use (29 RCNY § 2-10 [d] [1]) or keep the space in residential use (*id.* § 2-10 [d] [2]).  The record contains no suggestion that Aurora or its predecessors ever sought to return Unit 3B to commercial use, and Aurora has advanced no such argument.

Neither the MDL nor the ETPA contains any suggestion that, by purchasing an existing loft tenant's rights, the illegal unit either becomes legal or is stripped of the Loft Law's tenant protections. Instead, the effect of the purchase is to remove the Loft Law's *rent regulation* provisions, not its *tenant protection* provisions. New York City regulations provide:

> "*If the unit is to remain residential after a sale of rights pursuant to MDL § 286(12), the owner remains subject to all of the requirements of Article 7-C*, these rules and orders of the Loft Board, including the legalization requirements of MDL § 284, except that the unit is no longer subject to rent regulation where coverage under Article 7-C was the sole basis for such rent regulation"

(29 RCNY § 2-10 [d] [2]) [emphasis added]).

In spite of this clear regulatory language—which the majority itself quotes (majority op at 5, 16)—the majority launches into an irrelevant discussion of the ETPA, *Wolinksy v Kee Yip Realty Corporation* (2 NY3d 487 [2004]) and *Acevedo v Piano Building LLC* (70 AD3d 124, 129 [1st Dept 2009]) to establish that the ETPA does not regulate IMD *rents* until a C of O is obtained, and then with neither explanation nor authority jumps to the conclusion that the 1998 purchase of the improvements and rights from the Lombardis eliminated the Loft Law's *eviction protection* for Mr. Locatelli. Left to guess at the majority's reasoning, I can think of two only possibilities: either the majority thinks that the anti-eviction protection is "rent regulation" under New York City's implementing regulation, or the majority thinks that the anti-eviction protection belongs to the initial tenant and does not run with the property. Neither is correct.

1

The Loft Law contains eviction protections distinct from its provisions regulating rent. A tenant's right to occupy the loft until the owner has brought the unit and building into compliance with the requisite health and safety standards is guaranteed, and is distinct both substantively and textually from the rent regulation provisions:

> "Prior to compliance with safety and fire protection standards of article seven-B of this chapter, residential occupants qualified for protection pursuant to this article *shall be entitled to continued occupancy*, provided that the unit is their primary residence, *and shall pay the same rent*, including escalations, specified in their lease or rental agreement to the extent to which such lease or rental agreement remains in effect or, in the absence of a lease or rental agreement, the same rent most recently paid and accepted by the owner; if there is no lease or other rental agreement in effect, rent adjustments prior to article seven-B compliance shall be in conformity with guidelines to be set by the loft board for such residential occupants within six months from the effective date of this article"

(MDL § 286 [2] [i] [emphasis added]). The two italicized provisions represent two different rights: the right to "continued occupancy" and the right "to pay the same rent" until the other rent regulation provisions in section 286 allow for rent increases. Nothing in the Loft Law's text or the text of the City's implementing regulation even remotely suggests that "rent regulation" was meant to include anti-eviction rights, and the regulation's express admonishment that "the owner remains subject to all of the requirements of Article 7-C, these rules and orders of the Loft Board" except for the Loft Laws own rent regulation cannot reasonably be interpreted to mean that the City intended a sale under MDL § 286 (12) to extinguish the Loft Law's anti-eviction prohibitions. Absent a legal ground for eviction, a tenant residing in an IMD unit and thus protected by

the Loft Law's anti-eviction provisions has the right to stay in the unit while the landlord

seeks a C of O regardless of the status of the tenant's lease.


2


This leads to the second possibility for the unstated rationale underlying the

majority's holding: perhaps the majority agrees that the anti-eviction protections are not

"rent regulation," but believes that a tenant's sale of rights under MDL § 286 (12)

eliminates all rights any future tenants may have, including anti-eviction rights. That

argument (I am guessing—because the majority offers no explanation for how it gets

around 29 RCNY § 2-10 [d] [2]) would depend on reading "residential occupants qualified

for protection pursuant to this article" in MDL § 286 (2) (i) to limit the Loft Law's

protections to the initial tenants, perhaps inheritable by successor tenants but not if the

initial tenant has sold the rights. No party has made that argument, and it cannot possibly

be right. First, if one read the statute that way, it would require voiding 29 RCNY § 2-10

(d) (2), which limits the effect of an MDL § 286 (12) sale to the Loft Law's rent regulation

provisions. The parties have not argued, and the majority does not conclude, that the City's

regulation is void. Second, the Loft Law defines "residential occupants qualified for

protection under this article" not by the date on which the resident occupied an IMD, but

as the "residents of an interim multiple dwelling" (MDL § 281 [3]). The date restrictions

contained in MDL § 281 concern the eligibility windows for buildings to be considered an

IMD, not the dates on which a tenant must have resided in an IMD to obtain the Loft Law's

protections. If the Legislature had intended to limit the Loft Law's protections to the

tenants in place at the time a building qualified for IMD status, it would have been easy to write the law to say so.


C

Apart from the plain language providing that a tenant's sale of rights affects only the Loft Law's rent regulation provisions, and not any other provisions, the majority's conclusion runs contrary to the Loft Law's purposes. The Loft Law strikes a balance by protecting loft tenants from eviction while allowing owners to collect rent even though the occupancy was illegal—and for which rent otherwise could not lawfully be collected. In other words, the hardship of eviction and the declared public emergency from a lack of affordable housing justified the legislative decision to permit continued occupancy even if a loft unit did not comply with health or safety standards, and the owners were allowed to fund some of the cost of legalization through rents that otherwise would have not been lawfully allowed—but only if the owners remained in compliance with the Loft Law's timetables. An owner's noncompliance disentitles the owner to recover rent for the illegal occupancy, but does not affect the public policy concerns driving the legislative decision to permit the illegal occupancy to continue: the shortage of affordable housing and the hardship of eviction.[6]

---

[6] That policy is reflected elsewhere in the Loft Law as well. For example, if an owner lets an IMD deteriorate to the point that the City determines it is unsafe for continued occupancy, the owner is required to pay the tenants for the value of their improvements; the owner is required to make all improvements necessary to obtain a residential C of O; and the tenants are entitled to resume occupancy thereafter (MDL § 284 [1] [xi]). This

We have previously held that the Loft Law protects tenants from eviction in an analogous context. In *Chazon, LLC v Maugenest*, we held that "the landlord of a New York City loft who has not complied with the Loft Law and has not received an extension of time to comply may not maintain an ejectment action based on nonpayment of rent" (19 NY3d 410, 413 [2012]). In that case, the tenant lived in a loft apartment with no C of O and had not paid rent for nine years (*id*. at 415). The owner, Chazon, argued that it could collect rents or evict the tenant for nonpayment even though it had "neither met the Loft Law deadlines nor obtained an extension of time from the Loft Board" (*id*. at 415). We concluded that "the landlord is not entitled either to collect rent or to evict the tenant" (*id*. at 413). Specifically, we held that MDL § 302 (1) barred the landlord from collecting rent because "Multiple Dwelling Law § 285 (1) makes an exception only for a landlord who is 'in compliance with' the Loft Law" (*id.*). Chazon was indisputably not in compliance with the Loft Law, so we held that it could not collect rent or evict the tenant for nonpayment of rent. In other words, we concluded that "the statutes [left] these parties in their present stalemate until compliance [with the Loft Law] has been achieved" (*id.*).

*Chazon* strikes right at the heart of the problem here, and lays bare the incongruity of the majority's position. Like Aurora, Chazon had failed to comply with the Loft Law. The tenant in *Chazon* had not paid rent for nine years; Mr. Locatelli unfailingly paid his rent for over six years, until Aurora rejected it. We held then that the Loft Law prevented

_____

further evidences the strong public policy behind the anti-eviction provisions of the Loft Law and City regulations.

Chazon from evicting its freeloading tenant, and yet today we hold that the Aurora may evict its paying tenant. The majority's result does not square with the Loft Law's text and the Legislature's and City's objectives. The clear expectation of the Loft Law—stated the statute itself and the legislative history—is for units subject to its regulations to "obtain a Class A multiple dwelling certificate of occupancy within 36 months from the effective date of this act" (Letter, Mayor Koch to Governor Carey, June 10, 1982, at 3; *see also* MDL § 284 [1] [i]). MDL § 302 (1) (b) prevents the dispossession of a tenant for nonpayment of rent—*including when the tenant's lease had expired*—if the landlord has failed to comply with Loft Law timelines. So, why would we permit dispossession of a tenant who continues to hold over but pays rent, when the owner is out of compliance with Loft Law timelines? The legislative penalty identified in *Chazon* for noncompliance with the Loft Law is not merely that the landlord may not collect rent but also that the tenant cannot be evicted (except for specified reasons not relevant here). That reflects a legislative judgment that, in addition to whatever monetary penalties the Loft Board may impose, the bar on collection of rent and bar on eviction were necessary teeth to motivate timely compliance and good-faith efforts.

In sum, the text of the Loft Law and the City's implementing regulations bar Aurora from evicting Mr. Locatelli. I would stop here in deciding this appeal.

IV

The question the majority says it "must" decide is "whether Loft 3B was subject to rent regulation 'solely' by virtue of the relevant provisions in the Loft Law such that, after the sale of the tenant's rights under section 286 (12), it was no longer subject to any form of rent regulation" (majority op at 9-10).  As discussed in Part V below, Aurora never made any such argument in Housing Court.  Temporarily putting that aside, the majority says it must decide whether a loft for which Aurora admits it cannot legally charge any rent is subject to rent regulation.  I suppose we might just as well answer whether Aurora's rental of Gracie Mansion to Mayor Adams is at a free-market or stabilized rate—both are purely academic questions.  Aurora has no more right to charge rent for Gracie Mansion than it does for 78 Reade Street, Unit 3B.

The fundamental problem with the majority's entire exercise is that this appeal is concededly not about rent regulation, and the provisions on which the majority bases its decision concern rent regulation only—not eviction protection.  The majority begins by citing to MDL § 286 (6) and (12) and 29 RCNY § 2-10 (d) (2), which, as previously discussed, exempt IMD units from "rent regulation" where the Loft Law "was the sole basis for such rent regulation."  The majority then reads those provisions as if they exempt qualifying IMD units from all elements of the ETPA and RSL.  But nothing in those provisions purports to say that qualifying units are exempt from the ETPA or RSL wholesale—they refer to rent regulation only.  Even if Unit 3B is not subject to rent regulation under the Loft Law, and even if it is not subject to rent regulation by any other law, it would remain subject to the tenant protection provisions of the Loft Law, as

discussed in Part III.  But even were it not subject to the tenant protection provisions of the

Loft Law, it would still be subject to the tenant protection provisions of the ETPA because

those tenant protection provisions are not "rent regulation."[7]


A


Proceeding as if "rent regulation" meant "all provisions in the ETPA and RSL," the

majority then points to a purported disagreement between the First and Second

Departments "over the impact of our holding in *Wolinsky* [*v Kee Yip Realty Corporation*

(2 NY3d 487 [2004])] on the issue of whether the ETPA applies to loft units that do qualify

---

[7] The Loft Law provides that a local legislative body can extend the ETPA's coverage to IMDs by a declaration of emergency (MDL § 286 [13]).  Shortly after the Loft Law's adoption, the New York City Council issued the requisite declaration, finding that "it is necessary and in the public interest that the Emergency Tenant Protection Act of 1974 apply to units occupied by residential tenants qualified for protection pursuant to Article 7-C of the Multiple Dwelling Law as set forth in such Article" (New York City Council Resolution No. 369, dated April 26, 1983, New York City Record, vol CX, p CC 10 [No. 32999], Supp for April 26, 1983; *see also Lower Manhattan Loft Tenants v New York City Loft Bd.*, 104 AD2d 223, 226 [1st Dept 1984], *affd* 66 NY2d 298 [1985] ["In accordance with (MDL § 286 [13]), the New York City Council passed a declaration of emergency declaring the necessity of applying the Emergency Tenant Protection Act of 1974 to units qualified for protection under article 7-C of the Multiple Dwelling Law (the Loft Law)"]).  Thus, pursuant to authority granted by the Legislature in the Loft Law, in 1983, the New York City Council directed that the ETPA cover IMDs.  Because the City Council acted in 1983 to subject all IMDs to the ETPA, Unit 3B was not "subject to rent regulation solely by reason of" the Loft Law (9 NYCRR 2520.11 [q]), and therefore the exclusions arising from the MDL § 286 (6) and (12) sale do not apply.  No party or lower court has mentioned MDL § 286 (13), the City Council's resolution implementing it, the Appellate Division's decision in *Lower Manhattan Loft Tenants* or our affirmance thereof, so I leave that issue for another day.

for Loft Law coverage" (majority op at 12).  *Bennett v Hawthorne Village, LLC* (56 AD3d 706 [2d Dept 2008]), the case cited by the majority for an interpretation of *Wolinsky* that conflicts with the First Department's interpretation, does not cite *Wolinsky* at all.  There is a disagreement, but it is not over the interpretation of *Wolinsky*.

Substantively, *Wolinsky*, *Bennett* and *Acevedo* have little or nothing to do with this appeal, though each for a different reason.  Starting with *Wolinsky*, the majority expands it to a wholly dissimilar situation.  In *Wolinsky*, we considered whether the ETPA applied to an illegally converted loft that could not possibly qualify for Loft Law protection (2 NY3d at 493).  Dispositively, the loft was located in a building that was in a zoning district that did not permit residential use, and the landlord had not "attempt[ed] to obtain a variance or other relief from the zoning restriction" (*id.* at 490).  "[U]nder these circumstances" we declined to "extend[]" the ETPA to cover the loft because it was not "legal or capable of being legalized" given its location in an zoning district that did not permit residential use (*id*. at 493).  Our analysis in *Wolinsky* emphasized that "[b]y adopting an eligibility period that was closed at the time of enactment, the Legislature demonstrated its intent to provide the benefits of the Loft Law only to existing residential tenancies, not to encourage new conversions of loft space" (*id*. at 492-493).  The majority mischaracterizes the holding of *Wolinsky* as "illegal loft conversions are not covered by the ETPA" (majority op at 13), a mischaracterization that is wholly untethered from *Wolinsky*'s rationale and that lacks any independent rationale.  A faithful reading of *Wolinsky* shows that case is not germane here: unlike the loft in *Wolinsky*, Unit 3B is (i) covered by the Loft Law and (ii) located in an area zoned for residential use.

More importantly, *Wolinsky* did not—and could not—involve a sale of rights under MDL § 286 because the unit at issue was ineligible for Loft Law coverage. Unlike the owner of the building in *Wolinsky*, Aurora remains obligated to "take all reasonable and necessary action to obtain a certificate of occupancy as a class A multiple dwelling" (MDL § 284)—which definitionally would be subject to the ETPA once that C of O was obtained. Likewise, the majority does not dispute that, if an owner has not purchased a tenant's rights in a unit covered by the Loft Law, the ETPA would cover the unit upon legalization. Thus, because the majority's claimed exemption of Unit 3B from the ETPA has nothing to do with *Wolinsky* (which involved no sale of rights under MDL § 286) or the legality or illegality of the conversion, it must derive from the effect of the MDL § 286 sale on the applicability of the ETPA and RSL.

*Bennett* and a string of First Department cases including *Acevedo* do disagree about the effect of an MDL § 286 sale on rent regulation under the ETPA. The anti-eviction protections were not at issue in either case. But even as to rent regulation—which is not at issue here—*Bennett* reached its conclusion without any significant statutory analysis, merely citing the City regulation exempting such sales from Loft Law rent regulation (not ETPA rent regulation) and two Appellate Division cases: *Matter of 315 Berry Street Corp. v Hanson Fine Arts* (39 AD3d 656 [2d Dept 2007]) and *Caldwell v American Package Co., Inc.* (57 AD3d 15 [2nd Dept 2008]). Neither case supports the Second Department's holding in *Bennett*. In *315 Berry*, the owner purchased the improvements and rights of all tenants, represented to the Loft Board that the building would be returned to commercial use, and thereafter allowed new residential tenants to move in (39 AD3d at 657). The court

held that the units *were* subject to the ETPA, despite the owner's prior purchase of rights (*id*.). In *Caldwell*, the tenants held a commercial lease in a commercial building that was "[i]neligible for protection under the Loft Law" (57 AD3d at 21). The court held that the building was not covered by the ETPA (*id*. at 24). Obviously, a commercial building that was not and could not become residential involved no sale of Loft Law rights.

The First Department's decision in *Acevedo*, in contrast, contains an extensive analysis of why a sale of a tenant's rights under MDL § 286 conveys only "'such person's rights in a unit'" (70 AD3d at 127 [quoting MDL § 286 (12)]), and "says nothing about rent stabilization or ETPA; [] says nothing about any subsequent tenant's rights; indeed, it says nothing about deregulating units in any way whatsoever" (*id.*). *Acevedo* found additional support for its conclusion in the Loft Board's regulations, "which contemplate that units formerly covered by the Loft Law may be subject to rent stabilization even after they have been 'deregulated' under the Loft Law" and in the "intent of the Loft Law, which was not to supplant rent regulation" (*id.*). The court further explained that "at the time of passage of the Loft Law, lofts that met statutory requirements were covered by the rent regulations, and this was not altered by the Legislature in passing the Loft Law or the amendment to the ETPA" (*id*. at 128).

The majority's criticism of *Acevedo* is not well-founded. The majority's analysis rests on its say-so conclusion that "the 'sole basis' language, which appears in similar form in the Loft Law and Rent Stabilization Code (*see* MDL § 286 [6]; 9 NYCRR 2520.11 [q]), merely reflects recognition of the fact that the legislature has periodically created tax

incentive and other programs through which non-stabilized units become (sometimes temporarily) subject to rent stabilization" (majority op at 14).

There are two main defects in that conclusion. First, the tax incentive and other programs operate by subjecting qualifying projects to the ETPA and RSL (*see*, *e.g.*, 28 RCNY § 5-03 [f]). Thus, even in the case of such tax abatement or incentive programs, the ETPA and RSL provide the basis for rent regulation—so *Acevedo* correctly concluded that the other bases for rent regulation were the ETPA and RSL. Second, simply because programs exist that temporarily bring certain dwellings into the ETPA and RSL, one cannot automatically reach the majority's conclusion: that the "sole basis" language was meant to refer *only* to such programs.

B

The majority offers an alternate rationale: because Unit 3B has not yet become either a Class A or a Class B residence, it is not a "housing accommodation" under the ETPA. The majority's position is antithetical to the position Aurora urged in Housing Court: that Unit 3B was subject to the ETPA until 1998, when it was removed from the ETPA's coverage by the luxury decontrol provision. In any event, the majority's position has no textual basis.[8] The ETPA regulates "all or any class or classes of housing accommodations

---

[8] The majority does cite 9 NYCRR 2520.6 [a], which defines "housing accommodation" for purposes of the RSL, but that definition undercuts the majority's position. It defines "housing accommodation" as "[t]hat part of any building or structure, occupied or intended

in a municipality" (McKinney's Uncons Laws of NY § 8625). The ETPA broadly "applies to regulate residential rents 'of all housing accommodations which it does not expressly except'" (*Wolinsky*, 2 NY3d at 491 [quoting *Matter of Salvati v Eimicke*, 72 NY2d 784, 791 (1988)]). In general, the ETPA regulates units if they were built before 1974 and are in buildings that contain six or more residential units (NY Admin Code § 26-504; McKinney's Uncons Laws of NY § 8625). It is undisputed that Unit 3B is in a pre-1974 building with more than six units occupied residentially; it could not have qualified for Loft Law coverage otherwise.

The majority attempts to inject uncertainty into the term "housing accommodation" by questioning whether an IMD without a C of O should be considered a "housing accommodation" (majority op at 14-15). Even putting aside the clarity of the statutory and regulatory text defining "housing accommodation" and our decisional law emphasizing the broad reach of the ETPA, deeming a loft residence registered for residential conversion to be not a "housing accommodation" is incongruent with the statutory scheme.

First, the Loft Law specifically permits lawful residential occupation of IMDs (MDL § 283). Second, once a unit becomes legalized, the Loft Law requires the Loft Board

---

to be occupied by one or more individuals as a residence, home, dwelling unit or apartment . . . ." Not only is Unit 3B residentially occupied, but any unit registered for residential conversion under the Loft Law necessary is one that is "intended to be occupied" as a residence. That same regulation, in subsection (b), illustrates that the City understood how to limit a definition to Class A or B residences, which it did not do when defining "housing accommodations." The majority also cites NYC Admin Code § 26-504 (a) (1) (b), (b), which does limit the application of the RSL—but not the ETPA—to Class A and B residences.

to set the initial rent (MDL § 286 [5]) and turn over jurisdiction to DHCR for normal rent stabilized regulation, if applicable (29 RCNY § 2-01 [m])—further confirmation of the legislative intent that IMDs should be deemed "housing accommodations." Nothing in MDL § 286 (6) or (12) purports to alter the definition of a "housing accommodation."

Because the ETPA applies to Unit 3B, Aurora may not evict Mr. Locatelli except for limited grounds allowed by law (9 NYCRR 2504.1). Because Aurora has not alleged a ground for eviction allowed under the ETPA, Aurora's holdover proceeding was properly dismissed. However, I reiterate that because the building is an IMD, it is the Loft Law's anti-eviction provisions that require dismissal of Aurora's holdover action, not the ETPA's.

V

The majority decides this case on a ground not advanced by Aurora in the court of instance. In numerous cases decided during my tenure, the Court has taken the position that an argument—not an issue—must be raised in the court of instance to be properly preserved for our review. I have, in dissent, repeatedly taken the opposite position: that an *issue* must be preserved for our review, but if that issue is preserved, we are not bound to the arguments made by the parties, because our job is to resolve correctly the issue raised, not to choose the less bad of the arguments offered by the litigants (*see Persky v Bank of American Natl. Assn.*, 261 NY 212 [1933] ["In our review we are confined to the *questions* raised or argued at the trial but not to the arguments there presented" (emphasis in original) (citing *Oneida Bank v Ontario Bank*, 21 NY 490, 504 [1860])]). That disagreement is best summarized in *Deutsche Bank National Trust Co. v Barclays*

*Bank PLC* (34 NY3d 327, 334 n 3, 338, 342-344, 347 n 9 [2019]), but is easily found in

other decisions (*see, e.g., Jin Ming Chen v Ins. Co. of the State of Pennsylvania*, 36 NY3d

133, 139 n 2, 165 n 5 [2020]; *Matter of Krug v City of Buffalo*, 34 NY3d 1094, 1095 n 2,

1097 [2019]; *Matter of Kosmider v Whitney*, 34 NY3d 48, 81-82 [2019]; *Matter of 381

Search Warrants Directed to Facebook, Inc.*, 29 NY3d 231, 247 n 7 [2017]).   I am

heartened to see that, at least in this appeal, the majority has come around to my view of

preservation.

In Housing Court, Aurora advanced a novel argument based on several sequential

steps:

(1) Because from 1983 to 1998, "the Premises was subject to regulation solely under

the Loft Law, [it was] *exempt from the ETPA and the RSL* pursuant to 9 NYCRR

2520.11(c).  As articulated in 9 NYCRR 2520.11(c), any building completed

prior to January 1, 1974 whose rents were regulated by any State or Federal Law

other than the Rent Stabilization Law or the City Rent Law, shall only become

subject to the ETPA, the RSL and the Code *after* termination of such regulation"

(Aurora's Housing Court Brief, *on file with* the Court [emphasis original]).[9]

---

[9] 9 NYCRR 2520.11 (c) reads: "[H]ousing accommodations in buildings completed or
substantially rehabilitated prior to January 1, 1974, and whose rentals were previously
regulated under the PHFL or any other State or Federal law, other than the RSL or the City
Rent Law, shall become subject to the ETPA, the RSL and this Code, upon the termination
of such regulation."  Far from supporting either Aurora's or the majority's position, the
subsection requires that, on termination of Loft Law rent regulation through the section
286 sale, Unit 3B immediately became subject to the ETPA, the RSL and the City Housing
Code.

(2) To bolster that argument, Aurora affirmatively and unquestioningly relied on *Acevedo*, arguing that "*Acevedo* held that once a Premises is no longer temporarily exempt from Rent Stabilization by virtue of the Loft Law, the ETPA provides for subsequent re-regulation *if the premises is otherwise covered*" (*id.* [emphasis added]). The majority now overrules the very authority on which Aurora affirmatively relied, to broaden the holding of *Wolinksy*, a case neither party cited to Housing Court.[10]

(3) The prior owner's purchase of the improvements and rights held by the Lombardis, pursuant to MDL § 286 (6) and (12), removed the unit from Loft Law rent regulation. However, unlike the majority, Aurora did not contend that the purchase of the Lombardis' rights itself removed Unit 3B from the ETPA or RSL.

(4) The next step in Aurora's argument was that "[a]n owner was in 1998 entitled to collect a new 'first rent' from an incoming tenant if the Premises has been vacant or temporarily exempt from the ETPA for four (4) or more years. 9 NYCRR 2526.1(a)(3)(iii) (1998)" (Aurora's Housing Court Brief).[11]

---

[10] It is true, as the majority observes (majority op at 17), that in Housing Court, Mr. Locatelli argued that Aurora could not win on its holdover claim unless *Acevedo* was overturned, but that hardly means that Aurora would automatically win if *Acevedo* was overturned. *Acevedo* was a roadblock, but not the only one, and, after overruling *Acevedo*, the arguments fashioned by the majority here to evade the remaining roadblocks are not ones advanced by Aurora in the court of instance.

[11] The subsection cited by Aurora in Housing Court does not exist. Part 2526, as in effect from 1987 to 2000, concerned enforcement by DHCR against violations by owners. Section 2526.1, entitled "Overcharge penalties; fines; assessment of costs; attorney's fees;

(5) Because the above exemption from the ETPA by virtue of Loft Law rent

regulation exceeded four years (1983-1998), 9 NYCRR 2526.1(a)(3)(iii)

authorized Aurora to set a "first rent" for the unit.

(6)  Aurora next argued that on December 16, 1998, it set a "first rent" of $4,250

to its new tenant; and

(7) Because that "first rent" was greater than the then-applicable luxury decontrol

threshold of $2,000 per month, the unit permanently escaped any rent

regulation via the luxury decontrol provision.

Aurora's argument concerning the inapplicability of the ETPA and RSL to Mr.

Locatelli's unit is fundamentally different from, and incompatible with, the majority's basis

---

rent credits" contained no rights of owners to set first rents.  Subsection (3) thereof concerns
complaints for overcharges.  The closest subsection to the phantom section cited by Aurora
is 9 NYCRR 2526.1 (a) (3) (ii), which reads:

> "As to complaints filed within 90 days of the initial registration
> of a housing accommodation, the legal regulated rent for
> purposes of determining an overcharge shall be deemed to be
> the rent charged and paid on April 1, 1980, or for a housing
> accommodation not required to be registered by June 30, 1984,
> four years prior to the date the housing accommodation was
> first required to be registered (or if the housing accommodation
> was subject to the RSL and this code for less than four years
> prior to such initial registration, the initial legal regulated rent),
> plus in each case, any lawful increases and adjustments.  Where
> the rent charged on such dates cannot be established, such rent
> shall be determined by the DHCR in accordance with section
> 2522.6 of this Title."

Nothing in that language, nor in any other regulation I have seen, supports Aurora's claim
that a four-year exemption from the ETPA permitted an owner to set a first rent.

for concluding those laws do not apply.[12]  Nothing in the majority's conclusion turns on

luxury decontrol, the fact that Aurora set an initial rent, or the fact that the unit was subject

to Loft Law rent regulation for more than four years, whereas Aurora's argument was

completely dependent on each of those facts.[13]

Perhaps for obvious reasons, neither any court below nor the majority has adopted

Aurora's argument.  Instead, the majority has fashioned a different rationale to allow

Aurora to evict Mr. Locatelli—one that is inconsistent with the argument Aurora made to

Housing Court.  By relying on the luxury decontrol threshold to escape the ETPA, Aurora's

argument, when taken to its necessarily conclusion, is that had the rent never exceeded the

(now nonexistent) luxury decontrol threshold, or had it obtained a C of O on the legally

required timeline, the unit would be subject to regulation under the ETPA.[14]  The majority's

---

[12] Indeed, in moving for summary judgment, Aurora relied on Loft Board orders establishing that even when an MDL § 286 (12) sale of rights rendered units "not subject to rent regulation," the owner must still "provide the residential occupant in the Unit with a residential lease subject to the provision regarding evictions and regulations of rent set forth in the Emergency Tenant Protection Act of 1974" (*Matter of Kiamie*, Loft Board Order 3581, June 17, 2010).

[13] Aurora's argument is perverse when framed against the Loft Law's requirements and policy.  The Loft Law requires that owners of an IMD obtain a C of O within three years.  Under Aurora's theory, had it timely complied with the Loft Law, even had it purchased the Lombardis' rights, it would not have been able to set the initial rent because the unit's rents would have been regulated by the Loft Law for less than four years, and the unit would be subject to the ETPA and RSL once the C of O issued.  It is only because Aurora failed to comply with the Loft Law's legalization requirements that, under the argument it presented to Housing Court, its purchase of rights gave it an avenue to escape the ETPA and RSL.

[14] Contrary to the majority's suggestion, Aurora at all times had the burden to establish a legal basis for Mr. Locatelli's eviction that was unrelated to the amount of rent Aurora could legally demand under the law.  Put another way, regardless of Mr. Locatelli's counterarguments, Aurora's action could survive only if there was a legal basis for eviction

holding is completely different: units within an IMD are not subject to the ETPA or RSL, and a purchase of rights under MDL § 286 (6) and (12) allows the owner of an IMD to prevent the ETPA and RSL from ever covering the units in that IMD.

Although I disagree with the majority's decision for the numerous reasons I have articulated, the court has clearly not felt fettered to decide the appeal based on the arguments the parties made in Housing Court. Nothing like the majority's rationale can be found in the record before Housing Court. In one regard, however, I fully agree with the majority's approach: we are here to decide preserved issues of law correctly, even if no party has preserved or raised the correct rationale. If we wish to seek additional briefing because the parties have failed to address the issues sufficiently, we are always free to request that briefing—a common practice among state and federal courts.

VI

I offer this final observation. The Loft Law, though enacted by the Legislature, was created by and for New York City. As set out above, its design and purpose are clear: to speedily legalize a specified subset of previously commercial buildings being used to ease shortages in the chronically tight housing market, so as to minimize safety concerns and displacement of tenants while permitting owners to collect rent that would otherwise be

---

other than the nonpayment of rent because Aurora's action was not based on any failure or unwillingness of Mr. Locatelli to pay the agreed upon rent. Aurora has not asserted any valid ground for eviction given the Loft Law's anti-eviction protections, and thus it has failed to carry its burden.

illegal during the relatively brief period while necessary renovations occurred.  Owners

could buy out tenants, which might make sense if it was more profitable to do so and return

the building to commercial use than to make renovations necessary to convert a building

to residences.  Nothing in the statute or legislative history suggests that the Mayor or City

Council (or the Legislature, for that matter), intended to permit landlords to purchase their

way out of rent stabilization.  That idea is anathema to the legislative purposes.  DHCR's

regulations governing implementation of the ETPA instruct that they:

> "shall be construed so as to carry out the intent of the act to ensure that such
> statute shall not be subverted or rendered ineffective, directly or indirectly,
> and to prevent the exaction of unjust, unreasonable and oppressive rents and
> rental agreements, and to forestall profiteering, speculation and other
> disruptive practices tending to produce threats to the public health, safety and
> general welfare; and that the policy herein expressed shall be implemented
> with due regard for the preservation of regulated rental housing"

(9 NYCRR 2500.13).

The majority contends that *La Guardia v Cavanaugh* (53 NY2d 67 [1981]) is

"consistent" with its interpretation of *Wolinksy* (majority op at 11 n 5).  As the majority

does here, *Cavanagh* conducted a tortuous analysis to conclude that the definition of

"housing accommodation" did not reach class B dwellings, in the process recharacterizing

three of our prior decisions (*Kurcsics v Merchants Mut. Ins. Co.*, 49 NY2d 451 [1980];

*Matter of Zeitlin v New York Conciliation & Appeals Bd.*, 46 NY2d 992 [1979]; and

*Axelrod v Starr*, 41 NY2d 942 [1977]), just as the majority here has done with *Wolinsky*.

We decided *Cavanagh* on June 4, 1981.  On July 7, 1981, the Legislature sent to the

Governor a bill to reverse *Cavanagh*, effective retroactive to June 4, 1981, which the

Governor signed into law.  The sponsor's memorandum in support stated that "Residents of Class B multiple dwellings have been protected by the Emergency Tenant Protection Act since its enactment.  As a result of *La Guardia v Cavanagh* (6/4/81) these residents, 30,000 in all, will be subject to eviction.  This amendment will prevent that" (Senate Sponsor Mem. in Support, Bill Jacket, L 1981, ch 675, at 5).  Having failed 40 years ago to interpret the ETPA as the Legislature intended, we now say that an owner who has disobeyed the command of the Loft Law for decades, leaving residents in housing that does not comply with health and safety standards, and that has admittedly extracted rents it is legally barred from collecting, can evict a tenant who has paid that unlawful rent all along.  That, according to the majority is how the Legislature and City intended the Loft Law and ETPA to work.  As before, our Court may not get the last word.

Order, insofar as appealed from, reversed, with costs, respondent Raffaello Locatelli's cross motion for summary judgment dismissing the petition denied, petitioner's motion for summary judgment granted, matter remitted to the Civil Court of the City of New York for further proceedings in accordance with the opinion herein and certified question answered in the negative. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Singas and Cannataro concur. Judge Wilson dissents in an opinion, in which Judge Rivera concurs. Judge Troutman took no part.

Decided February 15, 2022